[No. 48346-9. En Banc. November 24, 1982.]

The State of Washington, *Respondent,* v. Dwayne
Earl Bartholomew, *Appellant.*

174

*Timothy K. Ford* and *Douglas W. Tufts,* for appellant.

*Don Herron, Prosecuting Attorney,* and *Michael R. Johnson, Senior Deputy,* for respondent.

*C. Danny Clem, Prosecuting Attorney,* and *Ronald A. Franz, Deputy,* amici curiae.

PEARSON, J.—Defendant Dwayne Earl Bartholomew appeals his conviction of aggravated first degree murder and sentence of death. Defendant presents five issues in this appeal: two relate to the sentence, and three to the conviction. The issues raised by defendant in respect of his sentence are:

1. Is the capital punishment statute, RCW 10.95, unconstitutional under the Eighth and Fourteenth Amendments on its face or as applied to defendant in this case?

2. Is the sentence of death imposed upon defendant invalid under *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968) by reason of jurors' being excluded for cause because they "thought" or "believed" that they could not vote for the death penalty no matter what the evidence showed?

The issues raised by defendant with respect to his conviction are:

3. Were defendant's due process rights violated by the prosecutor's failure to disclose before trial the results of polygraph tests which suggested that the prosecutor's key witness lied in respect of a critical piece of testimony?

4. Is defendant entitled to an evidentiary hearing to determine whether a jury selected in accordance with *Witherspoon v. Illinois, supra,* is biased with respect to defendant's guilt?

5. Was one of the alternative forms of aggravated first degree murder submitted to the jury unsupported by the evidence?

Our resolution of these issues is as follows:

1. Portions of the capital punishment statute (RCW 10.95) are unconstitutional to the extent that they fail to limit in any significant way the evidence that the prosecution may present at the sentencing phase of capital proceedings. Accordingly, the sentence of death imposed in this case is constitutionally invalid.

We do not find it necessary, however, to strike down the statutory scheme as a whole, since the constitutional defects which compel us to invalidate defendant's sentence of death may be remedied by restrictive application and by the severability provision, RCW 10.95.900.

2. Our resolution of the first issue makes it unnecessary to reach the second ground on which defendant challenges his sentence.

3. Defendant's due process rights were not violated by nondisclosure of polygraph results for which he made no request before his trial.

4. Defendant is not entitled to an evidentiary hearing to determine whether the *Witherspoon*–qualified jury was prone to favor the prosecution in the trial on guilt or innocence.

5. There was substantial evidence from which the jury could have found each of the alternative forms of aggravated first degree murder.

In sum, therefore, we affirm defendant's conviction but invalidate the sentence of death imposed upon him. This

resolution of the case raises a sixth issue, not considered by the parties to the appeal: Whether the appropriate recourse under RCW 10.95 following invalidation of a death sentence is to remand to the trial court to sentence defendant to life imprisonment without possibility of parole (RCW 10.95.090) or to remand for the impaneling of a second jury to consider anew whether to impose the death sentence (RCW 10.95.050(4)). We conclude that the appropriate procedure is to remand the matter to the trial court to sentence defendant to life imprisonment without possibility of parole.

Defendant was convicted of the aggravated first degree murder of Paul Edward Turner. The victim was an attendant at a Tacoma laundromat. He was shot once in the head with a .22 caliber weapon on the evening of August 1, 1981. A second bullet was found lodged in a counter near the body. On August 5, 1981, Rodney Leroy Bartholomew told the police that his brother, the defendant, had committed the crime. Defendant was subsequently arrested and admitted that he had robbed the laundromat and had shot the victim accidentally in the course of the robbery.

Defendant's trial began with jury selection on November 30, 1981. Forty–one prospective jurors were called and questioned. Six were excused for cause because they indicated they could not vote for the death penalty. Three of those thus excused said they had conscientious scruples against the imposition of the death penalty which they "thought" or "believed" would prevent them from returning a death sentence.

The prosecution's principal witness was defendant's brother, Rodney. He testified that he and his girlfriend, Tracy Dormady, went to the laundromat on the evening of August 1, 1981, to do their laundry. Defendant was sitting in his car in the parking lot when they arrived. While waiting for the laundry, Rodney sat with defendant in his car. Defendant told Rodney that he intended to rob the place and "leave no witnesses." Rodney and Tracy left the laundromat at 9:45 p.m., shortly before it was due to close. Soon

after they arrived at Tracy's house, defendant arrived. Tracy asked him if he had killed the attendant and defendant said "he had put two bullets in the kid's head."

Tracy also testified to the events of this evening. Her testimony differed in some details from Rodney's, but she said she heard defendant say he intended to leave no witnesses. Both Rodney and Tracy denied helping defendant in any way with the robbery.

The only defense witness was defendant. His testimony was similar to the statements he made to the police after his arrest. He testified that he went to the laundromat intending to rob it. He threatened the victim with his gun and forced him to lie on the floor. While defendant was removing the money from a cash drawer, his gun accidentally fired, discharging a bullet into the victim's head. As defendant fled with $237 from the cash drawer, the gun fired a second time.

Defendant denied telling Rodney and Tracy that he intended to leave no witnesses. Moreover, he testified that Rodney assisted in the robbery. According to defendant, Rodney did not leave before the laundromat closed, but waited outside until the attendant locked the doors. He then persuaded the attendant to unlock them on the pretense of having to use the bathroom. This allowed defendant to follow Rodney into the laundromat. After Rodney had left, defendant proceeded with the robbery.

The jury was instructed on aggravated murder in the first degree and murder in the first degree. After deliberating 5 hours, the jury returned a verdict of guilty of aggravated first degree murder.

The sentencing phase of the proceedings took place the following day. Pursuant to RCW 10.95.060(2), the prosecution was the first to present evidence. The prosecution's first witness was Stanley Bell, a cellmate of defendant. Bell testified that defendant told him he made the victim lie on the floor, asked him his age, was told 17, and replied "Too bad" and shot him. Bell further testified that defendant had threatened to kill both Rodney and Bell if they testi-

fied against him.

The prosecution then called two witnesses who testified that on October 30, 1980, and February 12, 1981, defendant had robbed grocery stores where they worked. These witnesses had picked defendant out of a lineup while the trial of the present charge was pending. Defendant had not been charged with these robberies, and there was no other evidence connecting him to them.

The prosecution's next witness was a police officer who testified that on September 25, 1980, he responded to a burglar alarm in a church and found defendant inside. A deferred sentence for criminal trespass arising out of that event was admitted into evidence. A second police officer testified to an incident on July 2, 1981, where defendant was found unconscious in a cow pasture. Defendant struck several of the aid crew who revived him and struck the witness when he attempted to subdue him. Assault charges filed as a result of this incident, but never disposed of, were admitted into evidence.

The prosecution's last witness was a psychiatrist who testified that defendant was competent and not insane. When asked if defendant would be a danger to people in prison, the witness said, "I see no reason for him to stop committing crimes."

The defense called only one witness, another psychiatrist. This witness testified that defendant suffered a "profound characterological disorder" which somehow impaired his capacity to care about the consequences of his action. The witness conceded that defendant posed a danger to others but estimated that there was a 50 percent chance that the disorder could, over a period of years, be overcome.

The jury deliberated 4 hours before returning a verdict imposing the death penalty. Sentencing was set for December 11, 1981.

On the date set for sentencing, defendant was granted an additional week to prepare a motion for new trial. On December 18, 1981, defense counsel moved for a new trial, additional time to prepare, appointment of experts, and an

evidentiary hearing. Defense counsel provided the court with copies of results of polygraph tests administered for the prosecution on Rodney Bartholomew. These results indicated that Rodney had given deceptive answers to questions about his involvement in the laundromat robbery. The results had not been disclosed to defendant until after the sentencing phase had been concluded. The trial court took these matters under advisement and on December 21, 1981, denied all defense motions and sentenced defendant to death. This appeal followed.

## I

We first consider the constitutionality of the procedures devised by the Legislature to facilitate the imposition of the death penalty. Defendant does not challenge the death penalty per se in this appeal. Rather, he limits his arguments to the proposition that the procedures of RCW 10.95 do not comport with the requirements laid down by the Supreme Court in *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972) and subsequent cases. We begin our analysis therefore with a consideration of the genesis of Eighth Amendment restraints upon the death penalty in these cases.

Until 1972 there were few cases which gave the death penalty a special constitutional significance. In *Furman,* Justice Powell referred to

the unswerving position that this Court has taken in opinions spanning the last hundred years. On virtually every occasion that any opinion has touched on the question of the constitutionality of the death penalty, it has been asserted affirmatively, or tacitly assumed, that the Constitution does not prohibit the penalty. No Justice of the Court, until today, has dissented from this consistent reading of the Constitution.

408 U.S. at 428.

Special consideration of the death penalty had been given in only two cases prior to *Furman.* The first of these, *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), condemned the practice of allowing pro-

spective jurors in capital cases to be excluded for cause if they expressed general objections to the death penalty. The Court was careful to limit the scope of this decision. In a footnote, the Court preserved the power of the State to exclude for cause jurors who make it unmistakably clear that they would automatically vote against the death penalty regardless of the evidence, or that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt. 391 U.S. at 522 n.21.

The second case, *McGautha v. California,* 402 U.S. 183, 28 L. Ed. 2d 711, 91 S. Ct. 1454 (1971), considered another feature of the operation of a capital jury. The defendants in *McGautha* argued that the jury's discretion to impose the death penalty violated due process because it was not limited or directed in any way by guidelines or standards. Justice Harlan, writing for the majority, referred to the history of the death penalty to refute the argument.

> This history reveals continual efforts, uniformly unsuccessful, to identify before the fact those homicides for which the slayer should die.

402 U.S. at 197.

> Those who have come to grips with the hard task of actually attempting to draft means of channeling capital sentencing discretion have confirmed the lesson taught by the history recounted above. To identify before the fact those characteristics of criminal homicides and their perpetrators which call for the death penalty, and to express these characteristics in language which can be fairly understood and applied by the sentencing authority, appear to be tasks which are beyond present human ability.

402 U.S. at 204. The Court accordingly affirmed the constitutionality of a broad sentencing discretion in capital cases.

A dramatic reversal in the Court's discretion occurred the following year in *Furman v. Georgia, supra.* A majority of the Court nullified the capital punishment laws of 39 states and the District of Columbia. 408 U.S. at 417 (Powell, J., dissenting). Each member of the Court wrote an opinion.

Two Justices, Brennan and Marshall, considered the death penalty violated the Eighth Amendment proscription of cruel and unusual punishment, no matter what the circumstances of its imposition. Three Justices, Douglas, Stewart, and White, voted to strike down the death penalty statutes before them because of the manner in which the penalty was imposed. The four remaining Justices, Burger, Powell, Blackmun, and Rehnquist, refused to strike down the penalty, adhering to the view that the desirability of capital punishment was a legislative issue rather than a constitutional matter to be determined by the Court.

The crucial opinions in *Furman* are those of the Justices who overturned the death penalties before them without going so far as finding capital punishment absolutely prohibited by the Eighth Amendment. *See Gregg v. Georgia,* 428 U.S. 153, 169 n.15, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). Justice Douglas was concerned with the selective application of the penalty to the poor and to unpopular minorities. He wrote that discretionary death statutes (of the type upheld in *McGautha*) violated the Eighth Amendment because they were "pregnant with discrimination." *Furman,* 408 U.S. at 256–57. Justice Stewart voiced similar concerns and concluded that the Eighth Amendment prohibited the imposition of the death penalty "wantonly" and "freakishly" on a capriciously selected random handful of defendants. *Furman,* 408 U.S. at 310. Justice White argued that the infrequency of the imposition of the death penalty nullified any deterrent or retributive value it might have, and that moreover "there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman,* 408 U.S. at 313.

*Furman* stimulated a flurry of legislation as the states scrambled to conform their death penalty statutes to the Court's requirements. By 1976, at least 35 new statutes had been enacted imposing the death penalty for homicides. *Gregg v. Georgia,* 428 U.S. at 179–80. However, distilling the essence of the Court's holding in *Furman* proved a difficult task. The various legislatures adopted two types of

response, both of which sought to obviate the concerns expressed by the three middle ground opinions. *See* Browning, *The New Death Penalty Statutes: Perpetuating a Costly Myth,* 9 Gonz. L. Rev. 651, 677 (1974). First, a number of states (including Washington) sought to conform to *Furman* by eliminating completely the discretion upheld in *McGautha.* These states enacted new statutes requiring the mandatory imposition of the death penalty for specified offenses. The second type of response was to retain the jury's discretion, but to limit and channel it by requiring consideration of specified aggravating and mitigating circumstances in determining whether to sentence a particular murderer to death.

The next phase in the strange, eventful history was the Supreme Court's consideration of appeals from death sentences imposed under these new statutes. In 1976, five such cases were decided. These cases exhibit scarcely more unanimity than *Furman* and none has a clear majority. Nevertheless, some of the uncertainties engendered by *Furman* were laid to rest.

First, a majority of the Court has now stated that the sentence of death for the crime of murder is not a per se violation of the Eighth Amendment. *Gregg v. Georgia,* 428 U.S. at 176 (opinion of Justices Stewart, Powell, and Stevens, with which Justices White, Burger, and Rehnquist concur). We note parenthetically that in subsequent cases the Court has limited the application of the death penalty by finding it excessive and therefore cruel and unusual when imposed for the rape of an adult woman (*Coker v. Georgia,* 433 U.S. 584, 53 L. Ed. 2d 982, 97 S. Ct. 2861 (1977)) and for felony murder where the defendant did not take life, attempt to take life, or intend to take life. *Enmund v. Florida,* ___ U.S. ___, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982).

Second, the 1976 decisions clearly indicate that the mandatory imposition of death sentences for specified homicides is unconstitutional. The plurality of Justices Stewart, Powell, and Stevens, which was the power center in the

1976 decisions, found three constitutional flaws in North Carolina's mandatory sentence scheme. *Woodson v. North Carolina,* 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976). First, most state legislatures had rejected mandatory death penalties, which indicates that the scheme did not accord with evolving standards of decency. 428 U.S. at 301. Second, the mandatory scheme

> does not fulfill *Furman's* basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death.

428 U.S. at 303. Finally, the North Carolina scheme fails

> to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death.

428 U.S. at 303. The majority in *Woodson* was completed by Justices Brennan and Marshall, who voted to strike the death penalty for the reasons they gave in *Furman* (*i.e.,* the death penalty is per se unconstitutional). Louisiana's mandatory death penalty scheme was struck down by the same bloc for the same reasons. *Roberts v. Louisiana,* 428 U.S. 325, 49 L. Ed. 2d 974, 96 S. Ct. 3001 (1976). The fact that Louisiana had a more narrowly defined group of offenses for which death could be imposed was irrelevant. 428 U.S. at 332.

The third development of the 1976 term was the upholding of the "channeled discretion" statutes of Georgia, Texas, and Florida. Once again the narrowest grounds for the decisions appear in the plurality opinions of Justices Stewart, Powell, and Stevens. *See Lockett v. Ohio,* 438 U.S. 586, 601, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978).

The Georgia death penalty statute was upheld in *Gregg v. Georgia,* 428 U.S. 153. The statute provided a bifurcated trial in capital cases. The defendant's guilt is determined in the first phase, and the death penalty decision made in the second phase. The availability of the death penalty is limited. It can be imposed only upon conviction for murder

with malice aforethought. And in addition, it can be imposed only if the jury at the sentencing phase finds beyond reasonable doubt that 1 of 10 aggravating circumstances exists. *Gregg,* 428 U.S. at 196–97. Death is not mandatory even if an aggravating circumstance is found. The jury can consider any other appropriate aggravating or mitigating circumstances in deciding whether to recommend leniency. If the death penalty is recommended, the aggravating circumstance found by the jury must be specified. Upon imposition of the death sentence, appeal lies automatically to the Georgia Supreme Court, which must consider three matters: First, whether death was imposed under the influence of passion and prejudice; second, whether the evidence supported the jury's finding of statutory aggravating circumstances; and third, whether the sentence was disproportionate to sentences in similar cases. *Gregg,* 428 U.S. at 198. The plurality of Justices Stewart, Powell, and Stevens wrote:

> On their face these procedures seem to satisfy the concerns of *Furman.* No longer should there be "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not."

428 U.S. at 198. Justice White, with whom Justices Burger and Rehnquist concurred, wrote in his concurrence:

> The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, and I cannot accept the naked assertion that the effort is bound to fail.

428 U.S. at 222. Accordingly, the Georgia statute was held constitutional.

Florida's death scheme was held to pass constitutional muster in *Proffitt v. Florida,* 428 U.S. 242, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976). "The basic difference between the Florida system and the Georgia system is that in Florida the sentence is determined by the trial judge rather

than by the jury." 428 U.S. at 252. The trial judge must weigh statutory aggravating and mitigating circumstances and justify the imposition of the death sentence with written findings. Automatic review by the Supreme Court of Florida is provided in all cases in which the death sentence is imposed. 428 U.S. at 250–51.

The Texas scheme, upheld in *Jurek v. Texas,* 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976), limits the death penalty to intentional murders in five situations. 428 U.S. at 268. The Court found that these five situations are functionally equivalent to the aggravating circumstances in the Georgia or Florida statutes. 428 U.S. at 270. In addition, the jury must answer three questions. If the jury answers all three affirmatively, then the death sentence is imposed. 428 U.S. at 269. The statute does not specifically provide for consideration of mitigating circumstances. Nevertheless, the Court noted that the Texas Court of Criminal Appeals had held that the jury could consider mitigating factors in answering one of the three questions. 428 U.S. at 272–73. Therefore, the jury was "allowed to consider on the basis of all relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed." 428 U.S. at 271.

The Supreme Court, by 1976, had thus sketched the outlines of a constitutionally acceptable death penalty scheme. A brief history of the death penalty in Washington will serve to illustrate how this state's Legislature and citizenry have struggled to comply with the dimly perceived constitutional requirements, as they have been revealed by the Court.

For 50 years prior to *Furman,* this state had a death penalty statute, passed in 1919. Laws of 1919, ch. 112 (codified as RCW 9.48.030). This law authorized the jury to impose the death penalty in cases of first degree murder. No guidelines were given the jury in the exercise of this discretion. Not surprisingly, the law was declared unconstitutional by this court following *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). *State v.*

*Baker,* 81 Wn.2d 281, 501 P.2d 284 (1972). Three years later the death penalty was reintroduced in RCW 9A.32-.046, the codification of Initiative 316. This provided for a mandatory death penalty for certain types of first degree murder accompanied by aggravating circumstances. This was the very type of statute nullified in *Woodson v. North Carolina, supra,* and *Roberts v. Louisiana, supra.* Consequently, this court declared it unconstitutional in *State v. Green,* 91 Wn.2d 431, 588 P.2d 1370 (1979). A new statute was enacted in 1977. Laws of 1977, 1st Ex. Sess., ch. 206 (codified in RCW 9A.32 and 10.94). This statute provided for the death penalty where, after having found a person guilty of premeditated first degree murder, the jury in a subsequent sentencing proceeding found: an aggravating circumstance, no mitigating factors sufficient to merit leniency, guilt with clear certainty, and a probability of future criminal acts of violence. This statute was found unconstitutional by reason of a procedural flaw (identified in *State v. Martin,* 94 Wn.2d 1, 614 P.2d 164 (1980)) in *State v. Frampton,* 95 Wn.2d 469, 627 P.2d 922 (1981).

The present statute is the latest attempt of the Legislature to conform to the somewhat obscure directives of the Supreme Court. At least in broad outline, the statute corresponds quite regularly to the schemes approved by the Court, in particular the Georgia statute upheld in *Gregg v. Georgia,* 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). The Washington statute is not, however, identical to any statute considered by the Supreme Court. Our task, therefore, is to determine whether the points of departure from the approved schemes represent constitutional defects in the death penalty statute. We will begin with an overview of the Washington statute before narrowing our enquiry to the features of the statute which cause us concern in this case.

The Washington statute, RCW 10.95, provides for a bifurcated proceeding in capital cases. After the defendant is adjudicated guilty of a capital murder, a special sentencing proceeding is held to determine whether there are suffi-

cient mitigating circumstances to merit leniency. RCW 10.95.050. Such a system was given explicit approval by the plurality in *Gregg v. Georgia,* 428 U.S. at 195.

> [T]he concerns expressed in *Furman* that the penalty of death not be imposed in an arbitrary or capricious manner can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance. As a general proposition these concerns are best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information.

Such a 2–phase, bifurcated proceeding was adopted in Georgia and upheld in *Gregg.*

The Washington statute limits capital murders to those committed with "premeditated intent." RCW 10.95.020; 9A.32.030(1)(a). The approved Georgia statute was similarly limited to "murder . . . with malice aforethought." *Gregg,* 428 U.S. at 196. The plurality in *Gregg* stated that where a life has been taken deliberately by the offender, the death penalty is not invariably disproportionate to the crime. *Gregg,* 428 U.S. at 187. The importance of limiting the class of capital murder was recently underscored by the Court's proscription of the death penalty for a felony murderer who does not himself kill, attempt to kill, or intend to kill. *Enmund v. Florida,* ___ U.S. ___, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982).

The class of offenses for which death may be imposed is further limited by the requirement that at least 1 of 10 aggravating circumstances must be found to exist before the sentencing authority can impose death. RCW 10.95.020. The statutory aggravating circumstances are similar but not identical to those of the approved Georgia statute. *Gregg v. Georgia,* 428 U.S. at 165 n.9. In *Gregg* the defendant argued that some of these aggravating factors were vague and therefore susceptible of widely differing interpretations, thus creating a substantial risk that the death penalty would be arbitrarily inflicted. The plurality rejected the

argument. It pointed out that even if certain aggravating circumstances could be given an overbroad interpretation there was no reason to assume that the Supreme Court of Georgia would adopt such an interpretation. *Gregg v. Georgia*, 428 U.S. at 201. This hope was not well founded. Four years later the Court reversed the Georgia Supreme Court because it failed to give a sufficiently narrow interpretation to one of Georgia's aggravating circumstances. *Godfrey v. Georgia*, 446 U.S. 420, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). The Court said:

> [I]f a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty. Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates "standardless [sentencing] discretion." It must channel the sentencer's discretion by "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process for imposing a sentence of death."

(Footnotes and citations omitted.) 446 U.S. at 428. The Court has made clear, therefore, that if the legislature fails to provide sufficient guidance in defining aggravating circumstances, then the state's supreme court in reviewing the death sentence must supply the omission, with an acceptably narrow interpretation. The validity of the aggravating circumstances therefore will depend upon this court's maintaining a clear and narrow interpretation of the aggravating circumstances to provide the sentencing authority with the constitutionally necessary guidance.

Conversely, a death penalty scheme is not invalid merely because aggravating factors are susceptible to an impermissibly broad interpretation.

We point out here that the Washington statute differs from most of the approved schemes in that it requires the aggravating circumstances to be proved at the guilt phase of the proceedings. RCW 10.95.020. (In Georgia, aggravating circumstances must be proved beyond a reasonable

doubt at the sentencing phase. *Gregg v. Georgia,* 428 U.S. at 164.) This is not necessarily a fatal flaw in the statute, as a similar scheme was approved in *Jurek v. Texas,* 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976). Nevertheless, the Washington statute differs significantly in other respects from the Texas statute approved in *Jurek*; the Supreme Court's approval of the Texas statute does not necessarily extend to RCW 10.95.

Like Georgia, Washington provides for a sentencing phase after guilt has been adjudicated. RCW 10.95.050. In the Georgia scheme, the jury, if it finds at least one aggravating factor is established beyond reasonable doubt, may consider any other appropriate aggravating or mitigating factors in deciding whether to impose death. *Gregg v. Georgia,* 428 U.S. at 197. The plurality in *Gregg* said of the Georgia statutory scheme:

> These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence. No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die. Instead, the jury's attention is directed to the specific circumstances of the crime . . . In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions for capital offenses? Are there any special facts about this defendant that mitigate against imposing capital punishment (*e. g.,* his youth, the extent of his cooperation with the police, his emotional state at the time of the crime).

428 U.S. at 197.

The Washington statute appears to be designed to achieve similar ends, but it is substantially different from its Georgian counterpart. The focus of the proceedings in the sentencing phase under RCW 10.95 is the special question the jury must answer.

> Having in mind the crime of which the defendant has been found guilty, are you convinced beyond a reasonable doubt that there are not sufficient mitigating circumstances to merit leniency?

RCW 10.95.060(4). An affirmative answer to this question must be unanimous. RCW 10.95.060(4). In deciding this question, the jury is directed to consider "any relevant factors" including but not limited to eight statutory factors. RCW 10.95.070.[1]

The final special feature of the Washington death penalty scheme is automatic sentence review by this court. RCW 10.95.100–.150.

The review process is patterned after that contained in the Georgia statutes, the most elaborate of the three statutory schemes approved by the Supreme Court. Briefly the process is as follows. The sentence review is automatic and is in addition to any appeal. RCW 10.95.100–.130(1). After a sentence of death is imposed, the clerk of the trial court is required to prepare and send a questionnaire to the Supreme Court. RCW 10.95.120. The heart of the review proceeding is RCW 10.95.130, which requires this court to determine three things: (1) whether there was sufficient evidence to determine that there were not sufficient mitigating circumstances to merit leniency; (2) whether the

---

[1]RCW 10.95.070 provides:

"In deciding the question posed by RCW 10.95.060(4), the jury, or the court if a jury is waived, may consider any relevant factors, including but not limited to the following:

"(1) Whether the defendant has or does not have a significant history, either as a juvenile or an adult, of prior criminal activity;

"(2) Whether the murder was committed while the defendant was under the influence of extreme mental disturbance;

"(3) Whether the victim consented to the act of murder;

"(4) Whether the defendant was an accomplice to a murder committed by another person where the defendant's participation in the murder was relatively minor;

"(5) Whether the defendant acted under duress or domination of another person;

"(6) Whether, at the time of the murder, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was substantially impaired as a result of mental disease or defect;

"(7) Whether the age of the defendant at the time of the crime calls for leniency; and

"(8) Whether there is a likelihood that the defendant will pose a danger to others in the future."

death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering the crime and the defendant; and (3) whether the death sentence was a result of passion or prejudice.

The review system approved in *Gregg v. Georgia* is substantially similar. *See* 428 U.S. at 198. The plurality placed significance on the review process, stating that

> the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here.

*Gregg v. Georgia,* 428 U.S. 153, 207, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976). The review procedures approved in *Proffitt v. Florida, supra,* and *Jurek v. Texas, supra,* were, however, considerably less elaborate than the Washington procedure.

In sum, the Washington statute shares the principal features of the approved schemes: Capital crimes are limited to premeditated murder; the death sentence may not be imposed unless additional aggravating factors are found by the jury; sentencing is considered at a separate phase of the trial at which the sentencer may consider a variety of factors in addition to the crime itself in determining whether or not to impose death; and each death sentence is subject to an elaborate automatic review procedure which brings it under the scrutiny of this court. The Washington procedure therefore conforms in broad outline to approved schemes.

■ We now proceed to consider the statute more closely to determine whether it fulfills the requirements of the Eighth Amendment. Whatever else may be obscure about the requirements, at least it is reasonably apparent that the constitution demands that a death penalty scheme fulfill two functions. First, it must "guide" and "regularize" the discretion of the sentencing jury and make the process of sentencing to death "rationally reviewable."[2] *Woodson v.*

---

[2] We note that in order that a death sentence be rationally reviewable it must at least be possible for a reviewing court to determine which of the 10 statutory

*North Carolina,* 428 U.S. 280, 303, 49 L. Ed. 2d 944, 96 S. Ct. 2978 (1976). And second, the scheme must allow the "particularized consideration" of the character and record of each convicted defendant. 428 U.S. at 303.

 The first of these requirements would seem to be satisfied by the limitation of capital punishment to offenses where the sentencer finds at least one of a number of statutorily specified aggravating circumstances. The plurality in *Gregg v. Georgia* states:

> While the jury is permitted [under the Georgia statute] to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled.

428 U.S. at 206. This passage also suggests that the Court approves consideration of any aggravating or mitigating circumstances, whether specified in the statute or not. The only limitation on this apparently broad mandate is that the information before the jury at sentencing should not be prejudicial to the defendant. This is clear from another passage in *Gregg*:

> We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions.

(Citation omitted.) 428 U.S. at 203–04.

Although these statements strongly favor the liberal reception of information at the sentencing phase, the Court in *Gregg* stopped short of holding that such was constitutionally mandated. However, that step was taken, at least

---

aggravating factors were found proved beyond a reasonable doubt. If more than one aggravating factor is put before the jury, as in the present case, the jury must be requested to specify which aggravating factors it found proved beyond a reasonable doubt. It is unnecessary for us to consider the effect of the prosecution's failure to do so in this case because we have invalidated defendant's death sentence on other grounds.

in respect of mitigating information, in later cases. In *Lockett v. Ohio,* 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978), the Court struck down the Ohio death penalty statute which limited to three statutory factors the mitigating circumstances that the sentencer could consider. The Court said that when mitigating information which might be put before the jury was limited in this way "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable". 438 U.S. at 605. The Court referred specifically to the second of the two functions identified above in explaining its holding:

> Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases.

438 U.S. at 605. The Court's determination to minimize "the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty" has led it to conclude that the Fourteenth Amendment requires a partial suspension of the rules of evidence at the sentencing phase of capital cases. In *Eddings v. Oklahoma,* 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982), the Court held that the due process clause prohibits the sentencer from refusing to consider as a matter of law any relevant mitigating evidence. Thus, mitigating evidence may not be excluded from the sentencing hearing on the grounds that it is inadmissible under, for example, the state hearsay rule. *See also Green v. Georgia,* 442 U.S. 95, 60 L. Ed. 2d 738, 99 S. Ct. 2150 (1979).

It is settled, therefore, that the constitution requires the jury to consider any information that may suggest defendant deserves a penalty less severe than death. However, RCW 10.95 goes significantly beyond this. It provides that at the sentencing phase the jury may consider "any relevant factors." RCW 10.95.070. Moreover, the jury may consider any relevant evidence regardless of its admissibility under the Rules of Evidence. While such liberal reception of mitigating information is mandated by *Lockett v. Ohio,* et al,

the Court has not yet considered specifically whether the same principles apply to aggravating factors. The statements in *Gregg v. Georgia* quoted above are apparently broad enough to apply equally to aggravating and mitigating information. Nevertheless, the reasoning in *Lockett* is applicable only to mitigating information. Furthermore, *Gregg* contains one significant limitation on its sweeping language; the information before the sentencer must not "prejudice" the defendant. 428 U.S. at 204.

The Court has not yet had occasion to explain how the concept of prejudice operates in the unique context of a capital sentencing procedure. Conceivably, any aggravating information could be said to prejudice a defendant, but presumably the Court intended to restrict the concept to undue or unreasonable prejudice. At the very least, the Court's recognition that a defendant may be prejudiced by the reception of information at his sentencing suggests that different criteria apply to aggravating factors than apply to mitigating factors.

No explicit guidance as to the content of these criteria appears in any decision of the Supreme Court. At least one federal court, however, has recognized that the channeling of jury discretion is impaired by allowing the jury to consider nonstatutory aggravating information. *Henry v. Wainwright,* 661 F.2d 56 (5th Cir. 1981).

> We believe that permitting the jury to consider whatever evidence of nonstatutory aggravating circumstances the prosecution might desire to present or the jurors might discern in the testimony opens too wide a door for the influence of arbitrary factors on the sentencing determination. By sanctioning consideration of statutory aggravating factors *plus anything else the jury determines to be aggravating,* such an instruction broadens jury discretion rather than channels it and obscures any meaningful basis for distinguishing cases in which the death penalty is imposed from those in which it is not.

661 F.2d at 59. We agree with the reasoning of the circuit court. The factors which render a defendant liable for the death penalty are the statutory aggravating factors listed in

RCW 10.95.020; unless at least one of such aggravating circumstances is found, the sentence may not constitutionally be imposed. For the objective of channeled discretion recognized in *Gregg* to be achieved, the statutory aggravating factor must be central to the jury's decision. If no nonstatutory aggravating factors are introduced, the reviewing court can readily conclude that a sentence of death was imposed because the jury decided that whatever mitigating evidence the defendant produced did not outweigh the statutory aggravating factor. This conclusion becomes less reliable as more nonstatutory aggravating matters are put before the jury. Therefore, to maintain the jury's channeled discretion and to preserve meaningful appellate review of sentences, the nonstatutory aggravating information received by the jury should be limited.

We do not, however, find it necessary that all nonstatutory aggravating information should be excluded. At least one nonstatutory aggravating factor is countenanced by the Supreme Court. In *Gregg* the Court recognized that the jury could inquire into a defendant's "record of prior convictions for capital offenses". 428 U.S. at 197. Defendant's criminal record, therefore, does not appear to be "prejudicial" as that term applies in this context. Nor do we believe that allowing the jury to consider defendant's record of convictions impairs the channeling of the jury's discretion or prevents meaningful appellate review. A criminal record is reasonably objective, reliable information, and probably helpful to a jury in determining a defendant's deservingness of death.

Different considerations apply, however, where the prosecution seeks to put prior criminal activity other than convictions before the jury. Here, the element of prejudice looms larger. At least one court has held that allowing the jury to consider a previous murder, of which the defendant was accused but never convicted, was so prejudicial as to be a violation of due process. *State v. McCormick,* 397 N.E.2d 276 (Ind. 1979).

To allow the jury which has convicted defendant of

aggravated first degree murder to consider evidence of other crimes of which defendant has not been convicted is, in our opinion, unreasonably prejudicial to defendant. A jury which has convicted a defendant of a capital crime is unlikely fairly and impartially to weigh evidence of prior alleged offenses. In effect, to allow such evidence is to impose upon a defendant who stands in peril of his life the burden of defending, before the jury that has already convicted him, new charges of criminal activity. Information relating to defendant's criminal past should therefore be limited to his record of convictions.

We find no reason to allow the prosecution, without regard for the mitigating information presented by the defendant, to put before the jury any nonstatutory aggravating information, other than defendant's criminal record. The constitutional requirement of a channeled jury discretion demands that, if the defendant produces no mitigating evidence, the prosecution should be limited to the factors proved at the guilt phase together with the defendant's criminal record. To this extent, we adopt the Fifth Circuit Court's holding in *Henry v. Wainwright, supra.* We depart from *Wainwright,* however, in allowing consideration of defendant's criminal record and in one other respect.

In our opinion, the prosecution should be entitled to produce information necessary to rebut mitigating evidence produced by defendant. Defendant's right to present mitigating evidence is limited only by the requirement of relevance. The Rules of Evidence designed to ensure the reliability of evidence received by the court do not apply to mitigating information in a capital sentencing proceeding. Unless the prosecution is permitted to test the reliability of defendant's evidence or attempt to rebut it, the jury may well approach the crucial sentencing decision from a distorted perspective. Such distortion could lead to arbitrary sentencing of the kind struck down in *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972). For these reasons, we hold that the prosecution should be entitled to produce evidence to rebut mitigating evidence pro-

duced by defendant.

This holding will require the trial court to evaluate the rebuttal evidence offered by the prosecution. Rebuttal evidence should be admitted only if it is relevant to a matter raised in mitigation by defendant. Evidence might be relevant, for instance, if it casts doubt upon the reliability of defendant's mitigating evidence. We do not intend, however, that the prosecution be permitted to produce any evidence it cares to so long as it points to some element of rebuttal no matter how slight or incidental. The court in determining whether to admit the prosecution's evidence should apply a balancing test similar to that contemplated by ER 403. The court must balance the extent to which the evidence tends to rebut defendant's mitigating information against the extent to which the evidence is otherwise prejudicial to defendant. Only if the rebuttal value of the evidence outweighs the prejudicial effect should the evidence be admitted.

█ These conclusions modify the capital punishment statute, RCW 10.95, in three significant ways. First, the portion of RCW 10.95.060(3) that authorizes the admission of evidence of a defendant's prior criminal activity (other than convictions) is inconsistent with the Eighth Amendment standards we have articulated. Therefore, we invalidate the provision authorizing the admission of "evidence of the defendant's previous criminal activity regardless of whether the defendant has been charged or convicted as a result of such activity." That portion of the statute may be severed without affecting the validity of the remainder of the statute. RCW 10.95.900.

Second, the remaining provisions in RCW 10.95.060 and the provisions of RCW 10.95.070 must be construed subject to the Eighth Amendment strictures we have identified in this opinion. Specifically, the liberal authority provided by RCW 10.95.060(3) to receive "any relevant evidence" must be limited to mitigating evidence only. Similarly, the jury's liberal mandate under RCW 10.95.070 to consider "any relevant factors" shall be limited to mitigating factors only.

The admission of evidence of aggravating factors and consideration by the jury of aggravating factors must be restricted to maintain the constitutionally required channeled discretion. Specifically, evidence of nonstatutory aggravating factors must be limited to defendant's criminal record and such evidence of additional nonstatutory aggravating factors as may be admitted by the court pursuant to the balancing test set forth above.

Finally, the provision in RCW 10.95.060(2) that the prosecution shall be allowed to make an opening statement and shall first present evidence must be limited in accordance with this opinion. This means that in most cases the only evidence with which the prosecution may open is defendant's criminal record. In the event that the sentencing jury is not the jury which convicted defendant of aggravated first degree murder, the prosecution may in addition present evidence of the facts and circumstances of the murder, as provided by the second paragraph of RCW 10.95.060(3).

The special sentencing proceeding in which defendant in this case was sentenced to die was tainted by these constitutional flaws we have identified. Evidence was admitted of criminal activity of which defendant had not been convicted. Nonstatutory aggravating information was not limited in the manner the Eighth Amendment requires. Therefore, the sentence of death imposed upon defendant is unconstitutional and invalid. The appropriate recourse following invalidation of the death sentence is discussed in issue VI of this opinion.

## II

In *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), the Court considered an Illinois statute which authorized the prosecution to exclude from the jury in a capital case all those prospective jurors who said they were opposed to capital punishment and all who indicated they had conscientious scruples against inflicting it. The Court defined the role of the jury in capital cases as

expressing "the conscience of the community on the ultimate question of life or death." 391 U.S. at 519. A jury from which had been culled all who expressed conscientious or religious scruples against capital punishment could not fulfill this role. Accordingly, the Court held

> that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

391 U.S. at 522. The Court did not, however, foreclose the exclusion for cause of jurors who are implacably opposed to the death penalty.

> If the State had excluded only those prospective jurors who stated in advance of trial that they would not even consider returning a verdict of death, it could argue that the resulting jury was simply "neutral" with respect to penalty.

391 U.S. at 520. The state's power to challenge for cause capital punishment opponents was elaborated upon in a footnote.

> [N]othing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt*.

391 U.S. at 522 n.21. Defendant argues that three jurors were challenged for cause in violation of *Witherspoon,* and that therefore the sentence of death may not be carried out. We have held that the sentence of death imposed upon defendant is invalid (see issue I above), and that defendant must therefore be sentenced to life imprisonment without possibility of parole (see issue VI below). It is therefore unnecessary to consider whether *Witherspoon* precludes

execution of defendant in this case.

## III

Defendant argues that his conviction must be reversed because the prosecution did not disclose that Rodney Bartholomew and Tracy Dormady had taken polygraph examinations, one of which indicated that Rodney had given deceptive responses to questions put to him.

The circumstances giving rise to this argument are as follows. On September 15, 1981, Tracy Dormady was interviewed by a police polygraphist and given three polygraph deception tests. Two relevant questions were asked during the polygraph test. First, "Did you in any way help Dwayne rob the laundromat on August 1, 1981?" Second, "Did you at any time on August 1, 1981, hold Dwayne's gun?" Ms. Dormady responded in the negative to both questions. The polygraphist concluded, "It is believed that this subject was being truthful in her answers to the relevant questions."

On September 23, 1981, Rodney Bartholomew was given four polygraph deception tests. Two relevant questions were asked during the test. First, "Did you in any way help Dwayne to rob the laundromat on August 1, 1981?" Second, "On August 1, 1981, at any time were you and Dwayne inside the laundromat at the same time?" Mr. Bartholomew responded in the negative to both questions. The polygraphist concluded, "The above subject was being deceptive when answering the relevant questions with a negative answer."

The record contains no indication that defendant made either before or during the trial or sentencing proceeding any request for the disclosure of the results, or any other information in the possession of the prosecution. The prosecution did not disclose to defendant that these tests had been given or the results.

After the trial and sentencing proceeding on December 11, 1981, defendant moved for discovery of any polygraph examinations performed by the prosecution. On December 18, 1981, defendant put before the trial court copies of the

polygraph examinations of Tracy Dormady and Rodney Bartholomew. He made a formal offer to prove that at least two witnesses against him at trial were given polygraph examinations prior to trial, the results of which were not disclosed to defense counsel or presented at trial. The trial court took these and other matters raised by defendant under advisement until December 21, 1981.

On December 21, 1981, defendant filed a supplementary motion for an evidentiary hearing in which he renewed an earlier request for such a hearing and made an additional offer of proof. In this motion, defendant offered to prove any facts regarding polygraph examinations in general, and the examinations in issue in particular, which the court deemed necessary to establish the admissibility of polygraph examinations on issues of guilt or sentencing.

The court denied all these motions. It ruled that nondisclosure of the polygraph examinations did not prejudice defendant in any way because polygraph examinations are inadmissible. The court refused to require or allow the parties to take any evidence on the reliability or admissibility of polygraph examinations.

Defendant argues that the prosecution's failure to disclose the results of the polygraph examination was a violation of his rights under the due process clause of the Fourteenth Amendment.

The due process clause was first held to prohibit the prosecutor's suppression, over defendant's request, of information favorable to defendant in *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). Defendant Brady and another man, one Boblit, were both convicted, in separate trials, of murder in the first degree and sentenced to death. At his trial, Brady admitted participating in the crime but claimed that Boblit did the actual killing. Prior to trial, Brady's counsel requested from the prosecution all copies of Boblit's extrajudicial statements. Several such statements were produced, but the prosecution withheld one in which Boblit admitted the actual homicide.

The Supreme Court held that suppression of Boblit's

confession was a violation of the due process clause of the Fourteenth Amendment.

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

373 U.S. at 87. The Court continued:

> A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant.

373 U.S. at 87–88. In the present case, defendant argues that this holding was violated by the prosecution's nondisclosure of the polygraph examination of Rodney Bartholomew.

The prosecution responds by arguing that the polygraph results are not "material to guilt" as required by *Brady,* because polygraph evidence is inadmissible in this state.

The general rule in Washington and in the majority of jurisdictions is that polygraph testimony is inadmissible absent stipulation by both parties. *State v. Renfro,* 96 Wn.2d 902, 905, 639 P.2d 737 (1982). The refusal to admit testimony of the results of polygraph examinations is based principally on the grounds that polygraph techniques have not yet obtained general scientific acceptability. *State v. Descoteaux,* 94 Wn.2d 31, 38, 614 P.2d 179 (1980); *State v. Woo,* 84 Wn.2d 472, 527 P.2d 271 (1974); *State v. Pleasant,* 21 Wn. App. 177, 583 P.2d 680 (1978). "This is an area of the law fraught with sensitive emotional and policy considerations and long scarred with legal and scientific battles." *State v. Pleasant, supra* at 185. Even if we were to be persuaded of the reliability of polygraph examinations, we would be confronted by a legion of arguments against the admissibility of polygraph testimony. These arguments include:

> (1) the veracity of a witness or defendant is an improper subject of expert testimony; (2) a jury is likely to place

undue reliance on polygraph results and, therefore, is likely to be misled by them; (3) their admission would result in a great and unnecessary waste of time; (4) their admission would cause a grave confusion of the issues; (5) their admission could lead to unfair prejudice to parties; and, (6) the possible uses of polygraph results, except possibly in rare instances, do not come within any accepted evidentiary rule.

Abbell, *Polygraph Evidence: The Case Against Admissibility in Federal Criminal Trials,* 15 Am. Crim. L. Rev. 29, 60–61 (1977). The general rule that polygraph testimony is inadmissible is, therefore, one which will not be departed from lightly.

Defendant responds to the prosecution's argument by presenting two alternative positions. First, he argues that, even if inadmissible, the polygraph results are nevertheless material to his conviction, in that, had he known of the polygraph results, his trial preparation would have been different. Alternatively, he argues that, despite the general rule of inadmissibility, the results of the polygraph examination were admissible.[3]

■ Whatever validity these arguments might otherwise have, it is unnecessary for us to reach them in this case. In all of these arguments, defendant appears to have underestimated the significance of the Supreme Court's decision in *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). This decision establishes two principles which together determine the outcome of the issue before us. First, the Court in *Agurs* recognizes a distinction between a defendant's Fourteenth Amendment right to disclosure, and a defendant's right to discovery under state procedural rules. 427 U.S. at 109. Second, the Court holds that if a defendant fails to request disclosure, constitutional error is committed by nondisclosure only "if the omitted

---

[3]Defendant also argued that, even if inadmissible in the guilt phase, the polygraph results would be admissible at the sentencing proceeding, and that nondisclosure therefore invalidated the sentencing proceeding. We do not reach this argument because we have held on other grounds (issue I) that defendant's death sentence is invalid.

evidence creates a reasonable doubt that did not otherwise exist". 427 U.S. at 112.

The significance of the first of these principles to this case is that the extent of the defendant's disclosure right is not necessarily determined by his right to discovery under the court rules. This state has very liberal rules of discovery in criminal proceedings. CrR 4.7. These rules place an obligation upon the prosecuting attorney to disclose to the defendant a wide variety of information, including "results of physical or mental examinations and scientific tests, experiments, or comparisons" (CrR 4.7(a)(1)(iv)) and "any . . . information within his knowledge which tends to negate defendant's guilt". CrR 4.7(a)(3). The rules provide for a streamlined procedure whereby a defendant may request such information from the prosecution at an omnibus hearing. CrR 4.5(h). Despite provision for such requests for disclosure, however, the prosecution's duty to disclose under CrR 4.5 does not depend upon a request by a defendant. *See* CrR 4.7(a). Sanctions for violation of the discovery provisions are provided for in CrR 4.7(h)(7)(i); the sanction in a particular case is within the discretion of the trial court.

These rules of discovery are considerably broader than the right of disclosure articulated in *Agurs*. But *Agurs* specifically recognized that state procedural rules might go beyond the constitutional right. After discussing a rule which would require the prosecutor to allow complete discovery of his files as a matter of routine practice, the Court said,

> Whether or not procedural rules authorizing such broad discovery might be desirable, the Constitution surely does not demand that much.

427 U.S. at 109. Therefore, violation of the procedural rules of discovery does not necessarily violate a constitutional right of defendant.

To determine whether a constitutional violation has occurred, we must consider the second of the two principles we identified in *Agurs*. *Agurs* refined the *Brady v. Mary-*

*land* principle by defining three different categories of circumstances in which it might apply. 427 U.S. at 103. The constitutional test of materiality of suppressed evidence differs according to the category into which the particular case falls.

The first category is where

the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.

427 U.S. at 103. In such a case, the defendant has the lightest burden of proving materiality. The conviction "must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103.

 Defendant makes an argument that the present case falls within this category. The argument would require us to conclude that the prosecution knew or ought to have known from its polygraph examination that Rodney Bartholomew's testimony was perjured. Implicit in such a holding would be a conclusion that polygraph examinations are so reliable that the prosecution should as a matter of law know that testimony declared by a polygraphist to be deceptive is perjured. As we have indicated, considerable controversy exists as to whether polygraph evidence is sufficiently reliable to be admissible as evidence. In all this controversy we find no serious suggestion that a polygraphist's opinion that a response is deceptive is conclusive evidence of perjury. As might be expected, we are cited no authority to support such a conclusion, and our researches have revealed none. The present case does not, therefore, fall within the first category of *Agurs*.

The second category recognized in *Agurs* is the situation, illustrated by *Brady v. Maryland,* where a pretrial request was made for specific evidence. 427 U.S. at 104. In such a case, the *Brady* test of whether the information withheld "could . . . have affected the outcome," (427 U.S. at 106) will determine whether nondisclosure violated the due process clause of the Fourteenth Amendment. In the case

before us, the record shows that no request for disclosure was made until December 11, 1981, the day after the conclusion of the trial and sentencing proceeding. The case does not fall within the second *Agurs* category.

█ The third category recognized in *Agurs* is the situation where no request is made for information or where the request is so general as to amount to no request at all. *See Agurs*, 427 U.S. at 106–07. The facts in *Agurs* fell into this category. The Court concluded that in this category the defendant must shoulder a heavier burden under the constitutional standard of materiality. 427 U.S. at 112. The Court formulated this "higher burden" thus:

> [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

(Footnote omitted.) 427 U.S. at 112–13.

This is the test which must be applied in the present case. Assuming, without deciding, that the polygraph evidence would have been admissible, we must determine whether it would create a reasonable doubt of defendant's guilt which did not otherwise exist. In *Agurs,* the Court, in making this determination, placed considerable reliance on the trial judge's perception of the evidence. The Court said:

> Since [the suppressed evidence] was not requested and did not even arguably give rise to any inference of perjury, since after considering it in the context of the entire record the trial judge remained convinced of [defendant's] guilt beyond a reasonable doubt, and since we are satisfied that his firsthand appraisal of the record was thorough and entirely reasonable, we hold that the prosecutor's failure to tender [the suppressed evidence] to the defense did not deprive [defendant] of a fair trial as guaranteed by the Due Process Clause of the Fifth

Amendment.

427 U.S. at 114.

We reach a similar conclusion in the case before us. The trial judge in ruling on defendant's motions reviewed the whole case. He pointed out that defendant was represented by a vigorous, resourceful and experienced attorney. The trial was relatively straightforward. The critical testimony was that of Rodney Bartholomew and Tracy Dormady. In the trial judge's opinion, this testimony

> established rather strongly that this defendant had gone into this particular establishment with the idea he was going to rob this young attendant and leave no witnesses behind. Their inference was that he meant he was prepared to kill him at the time.

The trial judge pointed out that even if the reliability of the polygraph examination were assumed, the results did not necessarily cast doubt on Rodney Bartholomew's testimony.

> I can well appreciate that when he was asked whether or not he helped Dwayne rob the laundromat, I suppose in his brother's mind—that's Rodney—that maybe he did by not telling the victim that he was going to be robbed and murdered, and so for that reason he may very well have been deceptive, not knowing exactly which was the right way for him to proceed.

The trial judge also referred to the fact that Rodney Bartholomew's testimony was corroborated by Tracy Dormady.

> Now, Tracy Dormady testified, in my recollection, virtually to every single thing Rodney Bartholomew testified to, so there wouldn't appear to be any substantial likelihood that Mr. Rodney Bartholomew was being less than candid.

In order to discount Rodney Bartholomew's testimony, the jury would also have to discount Tracy's, and the polygraph results gave the jury no reason to do so. In fact, the results of Tracy's polygraph examination indicated that she was telling the truth, and, if anything, would give the jury even more reason to believe her.

Therefore, even in the event that defendant could estab-

lish that the suppressed evidence was admissible, that evidence is not constitutionally material under *United States v. Agurs, supra.* Therefore, nondisclosure of the polygraph examination of Rodney Bartholomew does not constitute a violation of defendant's due process rights, and does not require a reversal of his conviction.

## IV

In his motion for a new trial, defendant offered to prove facts which, if established, would have shown that he was denied his right to a fair and impartial jury. The trial judge denied this request. Defendant argues that this denial was error.

Defendant's argument is based on the contention that a jury selected in accordance with *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968) is more likely to convict than a jury selected without regard for jurors' scruples against the death penalty. A similar argument was considered by the Supreme Court in *Witherspoon* and rejected.

> The data adduced by the petitioner, however, are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.

(Footnote omitted.) 391 U.S. at 517–18.

The Court left open, however, the possibility that data might be adduced to establish that a death–qualified jury tended to favor the prosecution.

> [A] defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to *guilt.* If he were to succeed in that effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a

completely fair determination of guilt or innocence . . .
391 U.S. at 520 n.18. At least one court has held that an
evidentiary hearing was required to enable a defendant to
present evidence on this issue. *Grigsby v. Mabry,* 637 F.2d
525 (8th Cir. 1980). In that case, the trial court had denied
defendant's pretrial motion for a continuance so that evi-
dence could be developed to support an allegation that a
death–qualified jury is guilt prone. After his conviction,
defendant sought habeas corpus relief on the ground that
denial of the continuance so seriously denied his constitu-
tional right to an impartial jury that the denial amounted
to an abuse of discretion. The Court of Appeals agreed, and
held that defendant was entitled to an evidentiary hearing.

The only state supreme court to review the evidence pro-
duced in such a hearing is the Supreme Court of California.
*Hovey v. Superior Court,* 28 Cal. 3d 1, 616 P.2d 1301, 168
Cal. Rptr. 128 (1980). The defendant in *Hovey* made a pre-
trial motion to limit the exclusion for cause of prospective
jurors to be called to try his case. The evidentiary hearing
took 17 days and produced 1,200 pages of transcript and
1,000 pages of exhibits, including some 2 dozen studies,
experiments, and surveys. The court reviewed this evidence
in considerable detail, and concluded that the research data
were distorted by a failure to exclude from the surveys per-
sons who would vote automatically for the death penalty in
a capital case. *Hovey,* 28 Cal. 3d at 67–68.

This reasoning of *Hovey* was adopted by the Court of
Appeals in *State v. Peyton,* 29 Wn. App. 701, 630 P.2d
1362, *review denied,* 96 Wn.2d 1024 (1981). The court held
in *Peyton* that the data marshaled by the defendants there
shared the flaw identified in *Hovey,* and therefore failed to
establish that the death–qualified jury was so prosecution
prone as to violate the constitutional demands of jury neu-
trality.

Defendant in the present case did not, however, raise the
issue of the neutrality of a death–qualified jury before trial
or at the impaneling of the jury. The issue was first raised

on December 18, 1981, by way of a motion for a new trial. Defendant argued in support of the motion that he had been denied his right to a fair and impartial jury by the process of jury selection. He offered to prove that the flaws identified in *Hovey* had been cured and that a death–qualified jury is prosecution prone. On appeal, defendant argues that the trial court erred in denying his request for an evidentiary hearing.

■ Because defendant's request for an evidentiary hearing was made by way of a motion for a new trial, the appropriate standard of review is abuse of discretion.

> The granting or denial of a new trial is a matter primarily within the discretion of the trial court and we will not disturb its ruling unless there is a clear abuse of discretion.

*State v. Wilson,* 71 Wn.2d 895, 899, 431 P.2d 221 (1967).

We conclude that the trial court did not abuse its discretion in denying the request for an evidentiary hearing. Defendant cites no authority to suggest that he has a constitutional right to a post–trial evidentiary hearing to determine whether the jury that convicted him was impartial. We perceive an analogy between the request for such a hearing to produce data and a motion for a new trial based on newly discovered evidence. The rules provide that a new trial may be granted if defendant produces material evidence "which he could not have discovered with reasonable diligence and produced at the trial". CrR 7.6(a)(3). In this case, there was no reason whatever that defendant could not have produced before trial the data he sought to produce at the evidentiary hearing. The *Peyton* and *Hovey* decisions and all the data referred to therein were all available to defendant, and with reasonable diligence could have been put before the court prior to the impaneling of the jury. In both *Grigsby v. Mabry* and *Hovey v. Superior Court* defendant made the request for an evidentiary hearing before the trial began.

Moreover, neither the trial court nor this court has been referred to a single case where a conviction has been actu-

ally overturned because a defendant established that a death–qualified jury was not neutral on the issue of guilt. It therefore remains highly problematical whether defendant's assertions can be established by sufficient evidence.

For these reasons we conclude that the trial court's denial of defendant's request for an evidentiary hearing was not a clear abuse of discretion so as to require a reversal of defendant's conviction.

## V

Defendant argues that his conviction must be reversed because one of the forms of aggravated first degree murder submitted to the jury was unsupported by any evidence.

The jury was instructed that it could convict defendant of aggravated murder in the first degree if it found he, with premeditation, caused the death of the victim

> while in the course of, in the furtherance of, or in imme-diate flight from the commission of the crime of Robbery in the First Degree, *or* . . . to conceal the commission of the aforesaid crime of Robbery in the First Degree, *or* to protect or to conceal the identity of the defendant as the person who committed the aforesaid crime of Robbery in the First Degree . . .

The jury was told it had to be unanimous as to the alternatives, if any, it found were proved, but it was not required to specify which alternatives it agreed on.

In *State v. Golladay,* 78 Wn.2d 121, 137, 470 P.2d 191 (1970), we held that

> before the jury can be instructed on and allowed to con-sider the various ways of committing the crime alleged, there must be sufficient evidence to support the instruc-tions.

The test to be applied in determining whether there is suf-ficient evidence to support an instruction was held in *State v. Green,* 94 Wn.2d 216, 221–22, 616 P.2d 628 (1980), to be "whether, after viewing the evidence most favorable to the State, *any rational trier of fact* could have found the

essential elements [of the case] *beyond a reasonable doubt.*"

Defendant argues that no evidence was presented at his trial from which a rational trier of fact could have concluded that the victim was killed in an effort "to conceal the commission of the . . . crime of Robbery in the First Degree". Defendant argues that nothing suggested any attempt to conceal the fact that a robbery had occurred. The till was emptied and left open, and the victim left lying where he had been shot. The crime was discovered by the first person to enter the premises.

Defendant may well be correct in asserting that there is no substantial evidence that the victim was killed in an effort to permanently conceal the robbery of the laundromat. There is, however, substantial evidence to support a conclusion that the victim was killed to postpone for several hours the discovery of the robbery. The jury heard testimony that defendant stated his intention of leaving no witnesses to the robbery. The victim was the only witness, and the only person who could have raised the alarm immediately after the robbery. The robbery occurred after the closing of the laundromat, a fact from which the jury could infer that it was unlikely that anyone would discover the robbery until normal business hours the following morning.

There was sufficient evidence, therefore, to conclude that the murder was committed to conceal the commission of the robbery for sufficient time to allow the perpetrator to make good his escape and conceal evidence of his involvement in the robbery. The provision which defines the aggravating factor at issue, RCW 10.95.020(7), does not require that the murder be committed to achieve the permanent concealment of the robbery. Concealment for a significant period of time to allow the escape of the perpetrator falls within the clear meaning of the provision.

This interpretation of RCW 10.95.020(7) does not appear

to be so broad as to allow the "arbitrary and capricious" infliction of the death penalty proscribed in *Godfrey v. Georgia*, 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). It does not, contrary to defendant's suggestion, expand the scope of the aggravating factor to embrace what is inherent in any felony murder. Unless the jury is presented with evidence which suggests that the killing was intended to postpone for a significant period of time the discovery of the commission of the crime, the aggravating factor will not be established. Such evidence will clearly not be present in every case of felony murder.

## VI

The final issue to be resolved was not raised by the parties, but must nevertheless be confronted in order to determine the appropriate disposition of this case. The death penalty statute contains what appear to be conflicting provisions for the appropriate procedure to be followed when a death sentence is invalidated.

The first provision is RCW 10.95.090, which suggests that the appropriate procedure in the present case is to sentence defendant to life imprisonment without the possibility of parole under RCW 10.95.030(1). RCW 10.95.090 provides:

> If any sentence of death imposed pursuant to this chapter is commuted by the governor, or held to be invalid by a final judgment of a court after all avenues of appeal have been exhausted by the parties to the action, or if the death penalty established by this chapter is held to be invalid by a final judgment of a court which is binding on all courts in the state, the sentence for aggravated first degree murder if there was an affirmative response to the question posed by RCW 10.95.060(4) shall be life imprisonment as provided in RCW 10.95-.030(1).

The apparently conflicting provision is RCW 10.95-.050(4), which suggests that the appropriate procedure in the present case is to remand for a new sentencing proceeding at which a fresh jury could decide whether defendant is to die. RCW 10.95.050(4) provides, in part:

[I]f a retrial of the special sentencing proceeding is necessary for any reason including but not limited to a mistrial in a previous special sentencing proceeding or as a consequence of a remand from an appellate court, the trial court shall impanel a jury of twelve persons plus whatever alternate jurors the trial court deems necessary.

The choice confronting us, therefore, is between remanding defendant for sentencing to life without possibility of parole and remanding defendant for a new sentencing proceeding to determine anew whether he is to die or be imprisoned for life without parole.

We hold that RCW 10.95.090 is controlling. We base this conclusion upon an analysis of the language of the two sections and on two rules of statutory construction. RCW 10.95.090 specifically directs that if the sentence of death is "held to be invalid by a final judgment of a court after all avenues of appeal have been exhausted" the sentence "shall be life imprisonment as provided in RCW 10.95.030(1)." RCW 10.95.050(4), on the other hand, requires the impaneling of a new sentencing jury "if a retrial of the special sentencing proceeding is necessary for any reason including but not limited to . . . a remand from an appellate court".

This latter provision does not prescribe when a retrial of the sentencing proceeding is necessary; rather, it prescribes the procedures to be followed should such a retrial be necessary. A retrial is not necessary in the present case because RCW 10.95.090 specifically directs that upon invalidation of a death sentence, defendant shall be sentenced to life imprisonment without parole.

This conclusion is compelled by the rule of lenity, which requires that in a criminal case any ambiguity in a statute be resolved in favor of the defendant. *State ex rel. McDonald v. Whatcom Cy.,* 92 Wn.2d 35, 38, 593 P.2d 546 (1979). Even assuming that an ambiguity is created by the confluence of RCW 10.95.090 and RCW 10.95.050(4), we must resolve that ambiguity in favor of defendant. Under RCW 10.95.090 defendant is subjected to life imprisonment without parole; under RCW 10.95.050(4) defendant faces at

minimum life imprisonment without parole, but in addition is put in peril of his life a second time. The rule of lenity compels us to conclude that RCW 10.95.090 is controlling.

The same result is suggested by the principle that the terms of a specific statute take precedence over a general statute where both address the same concern. *State v. Workman*, 90 Wn.2d 443, 454, 584 P.2d 382 (1978). RCW 10.95.090 is specific in its application to cases where a death sentence is invalidated by final judgment of a court. If RCW 10.95.050(4) is to apply to such cases, it can only be by virtue of the general application of that provision to cases where retrial of the sentencing proceeding is necessary. The former provision takes precedence over the latter.

## CONCLUSION

Defendant's conviction of aggravated first degree murder is affirmed. The sentence of death is invalidated and defendant is remanded to the trial court to be sentenced to life imprisonment as provided in RCW 10.95.030(1).

ROSELLINI and WILLIAMS, JJ., concur.

UTTER, J. (concurring in part, dissenting in part)—I concur in sections II, IV, V, and VI of the majority opinion and concur in the result of section I. I would hold, however, that the Washington capital punishment scheme, no matter how construed, violates the Eighth Amendment and article 1, section 14 of our state constitution. Even as construed by the majority, the statute fails to provide sufficient guidance to the sentencing jury as to what facts and circumstances it may consider as aggravating factors in deciding whether to impose the death penalty. In addition, the Washington statute falls short of constitutional requirements by permitting imposition of the death penalty without a finding, *at the sentencing phase,* of at least one aggravating circumstance.

I

Initially, I agree that *Henry v. Wainwright*, 661 F.2d 56

(5th Cir. 1981), *vacated on other grounds,* 102 S. Ct. 2922 (1982) is correct in limiting a sentencer's consideration of aggravating factors to those specifically delineated by statute. I also agree that this does not prevent the State from introducing evidence to rebut evidence of mitigating circumstances produced by the defendant. The mere fact that such rebuttal evidence introduced by the State also tends to independently prove some nonstatutory aggravating factor does not per se bar its admission. As the majority notes, the admissibility of the proffered evidence should turn on whether its probative value for rebuttal outweighs the danger of unfair prejudice, *i.e.,* its tendency to prove an independent nonstatutory aggravating factor. ER 403 is the appropriate evidentiary rule to be applied.

I note two caveats, however, which must accompany the majority's analysis. First, the lower court must be especially alert to prejudice against the defendant and we must exercise close review. Generally, the trial court has wide latitude in balancing probative value against prejudice and will be reversed only for a clear abuse of discretion. *State v. Thompson,* 95 Wn.2d 888, 892, 632 P.2d 50 (1981); 5 K. Tegland, Wash. Prac. 246 (2d ed. 1982). Moreover, some courts have suggested that the balance under ER 403 is generally to be struck in favor of admissibility. *United States v. Day,* 591 F.2d 861, 878–79 (D.C. Cir. 1978). Such standards are inappropriate in a case involving the death penalty for it "is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida,* 430 U.S. 349, 358, 51 L. Ed. 2d 393, 97 S. Ct. 1197 (1977) (defendant must be made aware of information considered by sentencing judge).

The second caveat I note is that the majority's application of ER 403 in this context requires that it also extend the protections which accompany the rule. In particular, if rebuttal evidence is admitted which also has some prejudicial effect, the defendant is entitled to a limiting instruction

if he or she requests it. This is simply in accord with general evidentiary principles. *See, e.g.,* ER 105; *State v. Passafero,* 79 Wn.2d 495, 498, 487 P.2d 774 (1971); *State v. Pitts,* 62 Wn.2d 294, 297, 382 P.2d 508 (1963).

## II

*Henry v. Wainwright, supra,* does not, however, permit generalized consideration of the crime's facts and circumstances at a death penalty sentencing hearing. I concur in the majority's recognition that our statute permits the State to introduce, at the sentencing phase, evidence "concerning the facts and circumstances of the murder" when the sentencing jury differs from that which decided guilt. RCW 10.95.060(3). The necessary implication of this provision is that the jury may consider "the facts and circumstances of the murder" as an aggravating factor at the sentencing phase. I must disagree with the majority's implied holding that the federal and state constitutions permit unguided consideration of such a broad aggravating factor.

The policy underlying *Henry v. Wainwright, supra,* and the decisions of the United States Supreme Court is the effective channeling of the jury's discretion. *See Wainwright,* at 58–59.

> [W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

*Gregg v. Georgia,* 428 U.S. 153, 189, 49 L. Ed. 2d 859, 96 S. Ct. 2909 (1976); *Wainwright,* at 58–59. Yet the Washington statute provides absolutely no direction as to what facts and circumstances the jury is to consider and how it is to consider them.

Moreover, the category of "facts and circumstances of the murder" (*see* RCW 10.95.060(3)) is hardly in itself a "'clear and objective [standard]' that provide[s] 'specific and detailed guidance,' and that 'make[s] rationally reviewable

the process for imposing a sentence of death.'" (Footnotes omitted.) *Godfrey v. Georgia,* 446 U.S. 420, 428, 64 L. Ed. 2d 398, 100 S. Ct. 1759 (1980). Indeed, it is one of two broad categories into which all aggravating and mitigating factors generally fall, the other being the "character of the individual defendant." *See, e.g., Proffitt v. Florida,* 428 U.S. 242, 251, 49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976); *Gregg v. Georgia, supra* at 197. Permitting a jury to consider such a broad category of evidence with no further guidance will produce precisely "[t]he standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury" which was condemned in *Godfrey v. Georgia, supra* at 429. RCW 10.95.060(3) is therefore unconstitutional.

### III

Even with RCW 10.95.060(3) removed,[4] however, the Washington capital punishment statute does not sufficiently channel jury discretion. The statute permits a jury to do exactly what was proscribed in *Furman v. Georgia,* 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726 (1972)— "reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die". *Gregg v. Georgia, supra* at 197. It is conceivable that, even with *no* additional evidence presented at a sentencing hearing, a defendant might be sentenced to death. If a defendant pleads guilty, a jury may apparently impose death having heard no evidence at all.[5] Such results are indistinguishable from those condemned in *Furman.*

I respectfully disagree with the majority's contention that

---

[4]RCW 10.95.900 provides that the various sections of the capital punishment statute are to be construed as severable. The remainder of the statute is therefore uninfected by the unconstitutionality of RCW 10.95.060(3).

[5]Since production of mitigating evidence by the defendant "opens the door" to rebuttal evidence of the State, a defendant might choose to waive his or her right to produce such evidence. In such a case, the only evidence which the State could then produce at the sentencing phase would be prior criminal history. If the defendant has no past convictions, no evidence at all would then be produced.

the Washington statute satisfies Eighth Amendment requirements by requiring proof of an aggravating circumstance at the guilt phase. In reality this simply narrows the class of crimes for which capital punishment may be imposed. Such narrowing does not render *Furman* inapplicable. One of the state court decisions which was vacated and remanded at the time *Furman* was decided, *State v. Duling,* 21 Ohio St. 2d 13, 254 N.E.2d 670 (1970), *vacated,* 408 U.S. 936 (1972), involved a conviction under a statute much narrower than ours. *See Duling,* at 13 (defendant convicted of first degree murder of police officer); Ohio Rev. Code Ann. § 2901.04 (Page 1953) (separate statutory provision for murder of police officer); *compare* RCW 10.95.020. Similarly, in *People v. Fitzpatrick,* 32 N.Y.2d 499, 300 N.E.2d 139, 346 N.Y.S.2d 793, *cert. denied,* 414 U.S. 1033 (1973), the New York Court of Appeals held the New York death penalty statute unconstitutional under *Furman. Fitzpatrick,* at 512–13. That statute allowed imposition of the death penalty for only those murders where the victim was a police officer or the defendant a prisoner and was thus much narrower than the Washington statute. *Compare* N.Y. Penal Law § 125.30 (McKinney 1967) *with* RCW 10.95.020. To make application of *Furman* turn on the breadth of the class of capital crimes would require appellate courts to engage in detailed line drawing entirely inconsistent with their function.[6]

The statute approved in *Jurek v. Texas,* 428 U.S. 262, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976) differed significantly from that at issue here. It did greatly narrow the class of crimes for which death could be imposed (*Jurek,* at 268); however, it also required proof of three additional facts at a

---

[6]To date the only line drawing the courts have been required to perform has been along standard common law lines. *See Enmund v. Florida,* ___ U.S. ___, 73 L. Ed. 2d 1140, 102 S. Ct. 3368 (1982) (death may not be imposed for felony murder where there is neither intent nor attempt to take nor actual taking of life); *Coker v. Georgia,* 433 U.S. 584, 53 L. Ed. 2d 982, 97 S. Ct. 2861 (1977) (death may not be imposed for rape). There is no common law basis for distinguishing between the different types of premeditated murder specified in the Washington statute.

later sentencing phase. *Jurek,* at 268. Those additional facts were essentially aggravating factors.[7] In contrast, no additional facts need be proven at the sentencing phase under the Washington capital punishment scheme.

While *Jurek* does contain language which could be read to equate narrowing of the category of capital crimes with requiring proof of an aggravating factor at a sentencing hearing (*see Jurek,* at 270–71), that language is far from clear. Moreover, as I have noted above and other commentators have noted elsewhere, such a reading is inconsistent with the other decisions of the Supreme Court. *See, e.g., Constitutional Law—State Statute Allowing Jury Discretion in Imposing the Death Sentence Which Is Not Arbitrary and Capricious Does Not Violate the Eighth and Fourteenth Amendments,* 20 How. L.J. 500, 507 (1977).

The requirement that an aggravating factor be proven at the sentencing phase is not of mere facial importance. Its most obvious advantage is that it expands the range of admissible evidence. *See Gregg v. Georgia, supra* at 191. This benefits not only the State in its effort to prove the aggravating factor but correspondingly benefits the defendant who seeks to rebut the State's evidence. If the defendant can bring in a wider range of rebuttal evidence, he or she will have a better chance of preventing the State from proving the aggravating factor.

Proof of the aggravating circumstance at the sentencing phase has other advantages as well. One of those is "the clarification of the issues in the jurors' minds". Knowlton, *Problems of Jury Discretion in Capital Cases,* 101 U. Pa. L. Rev. 1099, 1135 (1953). Simultaneous consideration of aggravating and mitigating factors should aid the jury in focusing on the aggravating factor as a factor more relevant

---

[7]The additional facts which had to be proved were: (1) that the defendant acted deliberately and with the reasonable expectation that death would result; (2) that there was a probability that the defendant would commit future acts of violence; and (3) that the defendant's conduct was an unreasonable response to any provocation by the victim. *Jurek v. Texas,* 428 U.S. 262, 269, 49 L. Ed. 2d 929, 96 S. Ct. 2950 (1976).

to sentencing than to guilt. Moreover, making the aggravating factors part of the crime and having a jury separately consider them prior to considering any mitigating circumstances may cause the jury to attach disproportionate weight to the aggravating factors. *Cf.* Model Penal Code § 201.6, Comment 3, at 72 (Tent. Draft No. 9, 1959) (enumeration of only aggravating factors or requiring findings regarding only such factors might accord them disproportionate significance), quoted in *Jurek v. Texas, supra* at 271 n.6.

In sum, I believe that the Washington capital punishment statute, even as construed by the majority, does not pass constitutional muster. No similar statute has been approved by the Supreme Court and our statute is functionally indistinguishable from those disapproved by *Furman.*

## IV

With respect to the validity of the defendant's conviction, I concede that the polygraph evidence would not of itself have been admissible at the guilt phase of the trial. *See State v. Renfro,* 96 Wn.2d 902, 905, 639 P.2d 737 (1982). I am far from convinced, however, that confronting Rodney Bartholomew with the polygraph results in an adversary manner prior to trial would not have produced useful impeachment evidence, if not a change in Rodney's story.

In my view, this possibility is sufficient, for I believe the majority misreads *United States v. Agurs,* 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392 (1976). The "knowledge" of perjury required to bring undisclosed evidence within the first *Agurs* category described by the majority is not knowledge sufficient to prove perjury in court. Polygraph evidence which affirmatively indicates that a witness is lying, while not admissible in court, should raise doubt in the mind of a reasonable man as to the witness' truthfulness. *Cf. United States v. Hart,* 344 F. Supp. 522, 523 (E.D.N.Y. 1971). This is sufficient "knowledge" of perjury

under *Agurs.*

I would reverse the defendant's conviction. Barring such reversal, I concur in the majority's reversal of his death sentence but believe that established federal precedent renders both RCW 10.95.060(3), in particular, and RCW 10.95, as a whole, unconstitutional.

DOLLIVER, J. (concurring in part, dissenting in part)—I concur with the opinion of the majority except for section VI relative to the disposition of the case. On the issue of whether RCW 10.95.090 or RCW 10.95.050(4) is the controlling statute the majority chooses RCW 10.95.090. The reason given is: "This conclusion is compelled by the rule of lenity, which requires that in a criminal case any ambiguity in a statute be resolved in favor of the defendant." Majority, at 215.

Other rules of statutory construction are neglected by the majority: the Legislature is presumed not to engage in unnecessary or meaningless acts, *State v. Wanrow,* 88 Wn.2d 221, 559 P.2d 548 (1977); statutes should whenever possible be interpreted so no portion is superfluous, void, or insignificant, *Hayes v. Yount,* 87 Wn.2d 280, 552 P.2d 1038 (1976); and "all of the provisions of the act must be considered in their relation to each other and, if possible, harmonized to insure proper construction of each provision." *Burlington N., Inc. v. Johnston,* 89 Wn.2d 321, 326, 572 P.2d 1085 (1977).

It seems to me the "ambiguity" discovered by the majority does not exist and that the two sections of the statute are easily harmonized. When the orderly and logical sequence of the legislative scheme is spelled out, I believe it will become apparent RCW 10.95.050(4) is the applicable statute.

Once a defendant is adjudicated guilty of aggravated first degree murder, if notice of a special sentencing proceeding has been filed and served as provided by RCW 10.95.040, a special sentencing proceeding shall be held. RCW 10.95-.050(1). A jury shall decide the matters presented in the

special sentencing proceeding unless waived by the trial court with the consent of the defendant and the prosecuting attorney. RCW 10.95.050(2). If the defendant's guilt was determined by a jury, RCW 10.95.050(3) requires the same jury to hear the special sentencing proceeding unless unforeseen circumstances make it impracticable to reconvene the same jury, in which event the trial court may convene a jury pursuant to RCW 10.95.050(4).

RCW 10.95.050(4) provides:

A. If the defendant's guilt was determined by
 (1) a plea of guilty or
 (2) a decision of a trial court sitting without a jury, or
B. If a retrial of the special sentencing proceeding is necessary
 (1) for any reason including but not limited to a mistrial in a previous special sentencing proceeding or
 (2) as a consequence of a remand from an appellate court, then
C. The trial court shall impanel a jury of 12 persons plus whatever alternate jurors the trial court deems necessary.

RCW 10.95.060 and RCW 10.95.070 cover the procedures at the special sentencing proceeding while RCW 10.95.080 states the sentence which shall be imposed on the defendant following the action of the jury at the special sentencing proceeding.

RCW 10.95.090 provides if any sentence of death imposed by RCW 10.95 is

A. Commuted by the Governor, or

B. Held invalid by a final judgment of a court after all avenues of appeal have been exhausted by the parties to the action, or

C. If the death penalty established by RCW 10.95 is held to be invalid by a final judgment of a court which is binding on all courts of the state, then

D. The defendant shall be sentenced to life imprisonment without parole as provided by RCW 10.95.030(1).

 Given the posture of this case in the continuum of events, the language of RCW 10.95.050 and RCW 10.95.090, and the disposition of the case by the majority, I believe RCW 10.95.050(4) should apply. RCW 10.95.090 contemplates a situation of finality: commutation by the Governor of the death penalty; invalidation of the death penalty; invalidation of the death sentence "by a *final* judgment of a court after all avenues of appeal have been exhausted by the parties". (Italics mine.) In this case there has been no gubernatorial action, the statutory death penalty has not been held invalid (see majority, at 198), nor has there been an exhaustion of "all avenues of appeal" as contemplated by the statute. Presumably, the State could, if it chose, petition the United States Supreme Court to consider whether the application by this court of the United States Constitution to the special sentencing proceeding is proper. Certainly, if this court had held against the defendant, he could have petitioned the Supreme Court for review. RCW 10.95.090 envisions a finality relative to both the death penalty and the defendant which is not present here.

RCW 10.95.050(4) fits exactly the circumstances of this case. It contemplates a situation where there is a remand from an appellate court when there has been no final determination the death penalty or the death sentence are invalid. Rather, in an intermediate stage in the proceedings a state appellate court has held the statute does not meet the requirements of the United States Constitution and is remanding to the trial court.

Read in sequence, RCW 10.95 is not ambiguous but part of a harmonious whole. I see no warrant for the application of the rule of lenity. The court has chosen not to invalidate the entire legislative scheme for the special sentencing proceeding but rather to perform judicial surgery in order to make it valid.

I believe there should now be a retrial of defendant under the special sentencing proceeding as provided for by RCW 10.95.050(4) consistent with the principles estab-

lished by the majority opinion.

BRACHTENBACH, C.J., and STAFFORD, DORE, and DIMMICK, JJ., concur with DOLLIVER, J.

Reconsideration denied February 10, 1983.