IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 77078-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ROYALE TYRELL-SCOTT THORNTON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: April 15, 2019 |

ANDRUS, J. — Royale Thornton appeals his convictions for the second degree murder of Rahman Karriem and first degree assault of Jahlil Ray on New Year's Eve, 2014. Because the prosecutor shifted the burden of proof on self-defense during closing argument, we reverse the murder conviction and remand that charge for a new trial. We affirm the assault conviction but remand it for resentencing as his offender score for that offense may be affected by the outcome of any new trial on the murder charge.[1]

## FACTS

On the evening of December 31, 2014, Royale Thornton shot and killed Rahman Karriem. Karriem's best friend, Jahlil Ray, stood next to him as Thornton fired gunshots from the passenger window of a blue Ford Expedition. Karriem's

---

[1] Thornton was charged with and convicted of unlawful possession of a firearm, but does not appeal that conviction.

girlfriend, Maria Santos, who was walking nearby, saw the shooting occur. And Thornton's best friend, Carlos Pace, sat next to Thornton in the driver's seat of the SUV. Thornton and Pace fled the scene and police arrested them days later.

Initially, Thornton denied being involved in any shooting at the Victory Grocery Store in the Othello neighborhood of Seattle. Pace told police, however, that Thornton had shot Karriem. Santos and Ray identified Thornton as the shooter as well. And the shooting was captured on the store's surveillance video.

The State charged Thornton with second degree murder for the death of Karriem, first degree assault for allegedly shooting at Ray, and the unlawful possession of a firearm (UPFA). Pace was charged with rendering criminal assistance. Pace pleaded guilty to this charge and agreed to testify against Thornton.

At trial, Pace testified that he and Thornton drove to the Victory Grocery Store to purchase cigars before going to New Year's Eve parties. Pace drove the Expedition with Thornton in the front passenger seat. As they pulled up, they saw Ray and Karriem standing outside the store. Ray, Karriem, and Santos had walked to the store to purchase cigars as well.

Santos testified she went into the store leaving Ray and Karriem outside. When she came out a few minutes later, she saw Ray and Karriem talking to two men inside the blue SUV. She heard Ray ask "Are you trying to fight or not?" She then heard Karriem say "if you're not trying to fight, when I turn this corner, don't bust at me," meaning "don't shoot at me." She then saw Karriem take a step back,

and saw the passenger, later identified as Thornton, bend down like he was opening the door. Thornton then pulled a gun and started shooting out the window.

Thornton knew both Ray and Karriem. Ray and Thornton have known each other for most of their lives because their fathers were friends. Ray described a dispute arose with Thornton after they committed a robbery of a T-Mobile store approximately a month before Karriem's death. Ray said Thornton was angry because Thornton felt he did not get his "cut" of the proceeds from the theft and blamed Ray for it.

Thornton denied any involvement in any robbery. Thornton testified Karriem, a man he knew from middle school, was angry at Thornton for ending a relationship with his sister. Thornton claimed Karriem called him in August or September 2014, shouting obscenities at him for "messing [with]" his sister. Thornton testified that in late October 2014, a vehicle driven by Karriem's sister, Karriem, and Ray pulled up next to him at a red light in Tukwila. Thornton testified Karriem got out of the car and knocked on his window with a firearm. According to Thornton, he sped off while the light was still red, and Karriem's vehicle chased after him. Thornton stated that as he sped away at a high rate of speed, Karriem fired gunshots into his car, eventually causing Thornton to flip the car on the Martin Luther King, Jr. Way exit in South Seattle. Thornton testified he called Pace while Karriem was shooting at him and left a voicemail on Pace's phone in which gunshots could be heard in the background. He also testified after flipping the car, he was rescued by a female passerby who drove him to Pace's mother's house, after which Pace drove him to Harborview to be treated for his injuries.

Pace partially corroborated Thornton's version of events. Pace testified Thornton told him that Karriem had shot at him during a car chase. Pace had no personal knowledge of the shooting, but confirmed Thornton had left him the voicemail in which he heard the gunshots. Pace did confirm that on the night of the shooting, Karriem made angry comments to Thornton about his relationship with his sister. Pace, however, testified Thornton never told him about a high-speed car chase, flipping his car on a public roadway, or being rescued by a Good Samaritan. Pace also denied that Thornton ever showed up injured at his mother's house or that he drove Thornton to Harborview.

On New Year's Eve, when Pace saw Karriem and Ray in the parking lot of the corner market, he decided to get out of the SUV to talk to them, leaving Thornton in the vehicle. Pace approached the men, told them that Thornton was in the SUV and Pace knew about the shooting. Pace suggested that Thornton and Karriem resolve their dispute by going "head up," meaning a fist fight, so that things did not get any further out of hand. Santos testified she overheard Pace say, "Fuck all that shooting shit. Let's fight."

Ray's version of events was slightly different. Ray testified that Pace spoke only to him, not to Karriem, about fighting it out with Thornton. Ray testified Karriem played no role in the robbery, and any conflict was between Thornton and Ray, not Thornton and Karriem.

According to Pace, Karriem agreed to fight. Pace returned to the SUV and told Thornton that Karriem was willing to fight to settle their differences. Pace testified that Thornton initially agreed to the fist fight. Pace did a U-turn and parked

the SUV on the street behind the store with the front passenger side facing Karriem and Ray. Pace rolled down the passenger side window to enable Thornton to speak with Karriem and Ray.

Pace testified that Karriem was mad at Thornton that evening, and asked Thornton multiple times if they were going to fight. Thornton then refused to fight because he was dressed for partying, not for fighting. While they were talking, Santos joined the men. Ray testified, consistently with Santos, that Karriem said "when we leave, don't shoot." Pace also heard Karriem say something like "when I get around the corner, or anything like that, it's not going to be no funny ... shit, .... [Y]ou're not going to try to shoot me or nothing like that."

At that point, Pace told Thornton "you know, this could be deadly." Thornton said "Well, I'll go head up" and Pace, like Santos, thought Thornton was starting to get out of the SUV because Thornton reached out as if to open the door. But, according to Pace, Thornton instead reached his hand out the window and shot Karriem. Thornton fired five shots, one of which struck Karriem in the chest, killing him. Ray testified Thornton shot at him as well. Pace testified that as he drove the SUV away from the scene, he yelled at Thornton and demanded to know why he had shot Karriem. Pace stated Thornton said he did so because Karriem had "got over on him," confirming that Thornton felt shorted or slighted by Karriem.

Thornton admitted he intentionally shot Karriem but claimed he did so in self-defense. Thornton testified the earlier shooting incident led him to believe Karriem was carrying a gun. Thornton testified that Karriem kept his hands in his pockets, screamed obscenities at him, and moved back and forth towards the SUV

in what he discerned to be a menacing manner. When Thornton refused to fight Karriem, Thornton heard Karriem say "if I see you in the south end, if we get around this corner and I see you again, I'm going to get off." Thornton understood Karriem to mean he intended "get[ing] off a couple shots" at him. Karriem's movements, from Thornton's perspective, indicated Karriem was going to pull a gun, "[s]o I pulled faster." "It was either my life or his life. I had no choice. It's either he's going to shoot me or I'm going to shoot him." A loaded firearm was later found in Karriem's front jacket pocket.

Pace, Ray and Santos disputed Thornton's self-defense testimony. Pace testified that Karriem did not make any sort of threatening gestures toward the vehicle or Thornton. Pace further testified that Karriem did not say anything threatening and did not brandish a weapon. Ray and Santos similarly testified that neither Karriem nor Ray said anything threatening or did anything that could have been perceived as threatening. Pace and Ray both testified that before Thornton pulled the trigger, Ray and Karriem had begun to retreat. Pace confirmed Thornton never told him he shot Karriem in self-defense.

Thornton testified he did not intend to shoot Ray. Thornton stated he had no beef with Ray, Ray did not threaten him, and he was not concerned Ray was going to pull a gun on him. Although Thornton admitted he emptied his gun, a .38-caliber revolver, and bullets may have flown in Ray's direction, he explained that his gun had been modified with a feature he called a "lemon squeeze," which turned his revolver into an automatic weapon and when he pulled the trigger, all of the available rounds fired within a millisecond of one another. He stated the

kickback of the gun made his arm move uncontrollably. Police found a spent bullet embedded in a house near the Victory Grocery lot.

The State, however, presented direct and circumstantial evidence that Thornton intentionally shot at Ray. First, Ray testified Thornton shot at him that night. Thornton admitted Ray called him a week or two after the October 2014 shooting incident to apologize for having shot at him. Ray told him "they made me shoot at you." Thus, at least according to Thornton's version of events, it was Ray, and not Karriem, who had shot at him. Additionally, Maria Santos told police she thought Thornton wanted to fight Ray, not Karriem, that night. This testimony was consistent with Ray's testimony that Thornton's beef was with him.

Second, a ballistics expert testified that he had never heard of a revolver being modified into an automatic weapon. Thornton's description of the "lemon squeeze" did not make sense to the expert because this term actually refers to an additional safety feature added to a revolver that requires the shooter to squeeze the grip of the gun to disengage the safety lock. Neither the gun nor any spent casings were recovered; Thornton gave the gun away and threw out the casings.

After the shooting, Pace and Thornton fled the scene. Pace testified he pulled the vehicle over to the curb within a few blocks of the scene, got out and called a friend to pick him up. He testified he ran into Thornton later that night at a New Year Eve's Party. He claimed he spent the night with a woman in Seattle. On cross examination, he admitted that the woman with whom he spent the night was the owner of the blue SUV. He denied, however, that Thornton accompanied him to the woman's apartment. Pace testified he had no contact with Thornton

until he appeared at Pace's Tacoma apartment days later apologizing for involving him in the shooting.

Thornton's testimony regarding his and Pace's movements before and after the shooting differed significantly from Pace's version of events. Thornton testified the blue Expedition belonged to Charlie Ruth, an exotic dancer with whom Pace was having a sexual relationship. That evening, he and Pace dropped Ruth and her roommate off at a Seattle strip club where the women worked. Thornton stated that after the shooting, he and Pace drove the Expedition to the home of Pace's mother, where Pace gave ammunition to Thornton to reload his gun. He testified the two then drove together to a number of clubs, attending several different New Year's Eve parties together. He produced Facebook pictures he posted after the shooting in which Pace is clearly visible behind the wheel of the SUV and standing next to Thornton at the clubs they visited together.

Thornton testified Pace and he left the last club between 2:30 and 3:00 a.m. on the morning of January 1 to pick up Ruth and her roommate after which they drove to Ruth's Kent apartment for the night. Thornton testified he and Pace returned to Pace's Tacoma apartment the next day where he stayed until the two were arrested by police on January 9, 2015.

Both Ray and Santos identified Pace, known to them as C-Rat, as the driver of the Expedition and Santos identified Thornton as the shooter. Santos showed police Facebook postings from Thornton after the shooting in which he made several incriminating statements. In one posting, Thornton wrote "Save it for somebody who cares. C-Rat don't got nothing to do with it, nigga, but we'll see;

rest in piss, Junior." Ray, Santos, Pace and Thornton all testified that Junior was Karriem's nickname. In another post, Thornton wrote "Fuck them niggas; did HBJ make it or did he get popped too. LMAO, 2015, damn that's sad." Thornton identified "HBJ" as Ray. He confirmed that "LMAO" meant "laughing my ass off."

On the day of their arrest, Thornton and Pace were both questioned by investigating detectives. Thornton insisted he had nothing to do with the shooting and stated he was elsewhere that evening. Pace, however, admitted to being present during the shooting and identified Thornton as the shooter. The police videotaped these interviews.

On May 31, 2017, a jury convicted Thornton of second degree murder and first degree assault. Thornton waived his right to a jury trial on the charge of unlawful possession of a firearm (UPFA). On May 8, 2017, the trial court found Thornton guilty of that count based on stipulated facts. Thornton has not appealed the UPFA conviction. Thornton appeals his murder and assault convictions.

## ANALYSIS

Thornton seeks a new trial based on (1) alleged prosecutorial misconduct during closing arguments; (2) admitting the video of Pace's January 9, 2015, interrogation; (3) trial irregularities, including spectator outbursts and comments Pace made to Thornton while on the stand; (4) permitting a detective to describe what he observed in the surveillance video capturing the shooting; and (5) admitting jail phone calls Thornton made to friends and family; and (6) cumulative error.

We conclude the prosecutor improperly shifted the burden of proving self-defense to Thornton, requiring a reversal of the murder conviction. We affirm the other challenged rulings made by the trial court.

## 1. Prosecutor's Closing Argument

Thornton raises three challenges to the prosecutor's closing argument. First, Thornton contends the prosecutor misstated the law by informing the jury that motive was not an element of the charge of murder. Second, Thornton asserts the prosecutor impermissibly commented on Thornton's exercise of his Sixth Amendment right to counsel. Finally, Thornton argues the prosecutor impermissibly shifted the burden of proof of self-defense to Thornton. We reject the first two arguments but agree with Thornton that the prosecutor's comments on self-defense shifted the burden of proof.

To prevail on a claim of prosecutorial misconduct, the defendant must establish that the prosecutor's conduct was improper and prejudicial in the context of the entire record and the circumstances at trial. State v. McCreven, 170 Wn. App. 444, 468, 284 P.3d 793 (2012). When a defendant objected to the alleged misconduct, this court reviews the trial court's ruling for abuse of discretion. Id.

During the State's closing argument, the prosecutor stated:

Jury instruction number 12, it's in your packet, it grounds us and it tells us what we need to find in order to render a guilty verdict as to the charge of murder in the second degree. The instruction, as it's laid out in your instructions, lists them as four elements. I've taken the liberty to break them out into six, because I think it's easier to digest that way.

Those elements are that on or about December 31st, 2014, the defendant committed assault in the second degree against Rhaman Karriem, that the defendant caused the death of Rhaman Karriem,

that Rhaman Karriem was not a participant of the crime, and that this occurred in the state of Washington.

So although in jury selection, we discussed beyond a reasonable doubt in the abstract and in general, the law tells us specifically what we need to find beyond a reasonable doubt to find the defendant guilty. Only these six elements, nothing more and absolutely nothing less.

As we previously mentioned through the course of this trial, there are some unanswered questions, but just because a question remains unanswered, that does not equate to reasonable doubt. For example, why did Mr. Thornton shoot at Rhaman Karriem and Jahlil Ray on that New Year's Eve? Was it because of a pre-existing feud over a cell phone theft? Was it because of a breakup? Was it because he didn't want to get his party clothes dirty, or was it because he just simply snapped that day?

That question of why is sometimes referred to as motive. And as you can see, motive is absent. It's purposefully absent from the list of elements from the law.

The prosecutor then shifted to a discussion of Jury Instruction 19, the justifiable homicide instruction:

All six of these elements have been admitted by the defendant himself. However, although he admits to these six elements, he's now asserting the claim of self-defense. When it comes to the killing of another person, another human being, self-defense is also known as justifiable homicide.

When a defendant asserts such a defense, we must find beyond a reasonable doubt that this killing was not legally justified. How do we do that? Well, we're given another instruction, jury instruction number 19. A homicide is justifiable when, one, the defendant reasonably believed that Rhaman Karriem intended to inflict death or great personal injury, and, two, the defendant reasonably believed that there was imminent danger of such harm being accomplished, and, three, the defendant employed such force and means a reasonably prudent person would have used.

If any one of these steps is absent, then the defense fails. It fails beyond a reasonable doubt. And it makes the defendant guilty of murder. Members of the jury, this defense failed long before the defendant took the stand, didn't it?

The prosecutor discussed Thornton's inculpatory comments on social media, including a Facebook post in which he mocked Karriem, saying "Rest in piss, Junior," and Thornton's insistence to police that he was not at the store that night and had an alibi for the time of the shooting.

The prosecutor pointed to Thornton's jail phone calls, where he discussed the possibility of raising an alibi defense, an insanity defense and a self-defense theory after he had consulted with his attorney:

> The defendant admitted that in that call nine months after the killing, after he had been charged, after he poured over all of the paperwork, after he had done his legal research, after he consulted with his lawyer ... that all three defenses were still on the table.

At that point, Thornton objected; the objection was overruled.

The prosecutor returned to attack Thornton's credibility:

> Again, if one of these fails, the entire defense fails. Again, even assuming the defendant told us the absolute truth on the stand, where's the evidence –

Thornton objected, claiming the prosecutor was shifting the burden of proof to the defense. The trial court overruled the objection, stating that "[t]he jurors have been instructed that they determine credibility of witnesses and that the statements of attorneys are not evidence."

The prosecutor continued:

> Again, I'm simply analyzing the defendant's own words after he took an oath to testify in front of you. His own words don't provide any evidence that he reasonably believed Karriem intended to inflict death or great personal injury.
>
> Karriem didn't pull out his gun when the SUV pulled up. Karriem didn't pull out his gun when he was talking to Pace. Karriem didn't pull out his gun when he found out Thornton was in the SUV. Karriem didn't pull out his gun when the SUV pulled up alongside them.

Karriem didn't pull out his gun even when he was standing right in front of the defendant. Karriem never produced a weapon. Again these are all the defendant's own words. According to the defendant, Karriem kept both hands in his pockets, and at times he was trying to talk with his hands. Again if we were to accept his testimony as 100 percent credible, he fails to meet this first criteria, this first requirement. And by failing to meet this first requirement, self-defense fails. His defense fails.

We don't even need to move on to requirements 2 and 3, but we will. Requirement two, the defendant had a reasonable belief of imminent danger. Again, no weapon displayed by Karriem, no direct threats made by Karriem, no threats to cause imminent harm of death or great personal injury.

At best, at best, the defendant testified that there is a conditional threat of future harm, not imminent harm, a conditional threat of future harm, if I see you in the south end, if I see you around this corner, I'm going to get off. Right. Again his own words, his version. If these things were to happen in the future, I'm going to get off. That's the threat, as described by the defendant.

So by the defendant's own admissions, there is no imminent danger of death or great personal injury. Failing to meet this second requirement alone means that his defense fails, that this homicide was not legally justified. You don't need to go on to 3, but we will. The defendant told us that he went from Karriem's conditional threats of future harm directly to blowing him away with his fully automatic revolver, without any warning whatsoever.

Is that the force and means that a reasonably prudent person would use? I'd suggest to you not. He could have pulled his gun and just pointed it at Karriem, right? He could have said, get your hands out of your pocket while he has his gun, while he had his gun pointed at Karriem, he could have said, stop talking, get moving, leave.

Those are all reasonably prudent steps possibly. But instead he decided to meet words, a conditional future threat, with gunfire. Is that what a reasonably prudent person would do? Of course not.

So again, even taking the defendant's own testimony at full face value, he fails to meet this third requirement as well. Again if one part fails, the entire defense fails. And here the defendant fails all three, and that's if we were to take his testimony as credible. That's if we were to take his testimony at full face value.

Thornton first contends the prosecutor misstated the law when he argued the State had no need to prove a motive for the shooting because the State had to prove that Thornton's motive was not self-defense. Thornton takes the prosecutor's statement about motive out of context. A fair reading of the argument shows the prosecutor's comment was made only in the context of outlining the elements in the "to convict" instruction. Under RCW 9A.32.050, the State has no obligation to prove motive in order for a jury to convict a defendant for murder in the second degree. Given the context in which the "motive" statements were made, we find no misstatement of the law.

Thornton next argues the prosecutor improperly commented on his exercise of his Sixth Amendment right to counsel when the prosecutor argued Thornton did not claim self-defense until after meeting with an attorney. We reject this argument as well. The record shows the comments were not focused on Thornton's decision to exercise his constitutional right to counsel. The prosecutor argued:

> And what did he say to [detectives]? I don't know what you're talking about; I haven't been to that store in years; I was at my grandma's house at the time of the shooting; I was at the club; I have alibis. Again not even a hint of self-defense, not even a hint of fear, not even a hint that this was justifiable homicide.
>
> Even when police specifically gave him an out, he adamantly denied that this was an act of self-defense. ....
>
> Instead we have more of the same, Carlos Pace needs to keep his mouth shut; they don't have any evidence; I was at the club; I have alibis; they don't have the car; they don't' have the gun; they don't' have shells; they don't have witnesses; Carlos Pace should claim that he was too intoxicated to remember.
>
> ...

> And even when self-defense does come up in those [jail] calls, nine months later, he still doesn't say, I acted in self-defense. He still doesn't say, my life was in danger that night. Instead the defendant says, I'm trying to use self-defense.

In context, the comment about consulting counsel focused the jury on Thornton's delay in contending he feared for his life, a defense that conflicted with the calculating nature of his pretrial jail phone call comments.

The comment is not analogous to the improper statement in State v. Moreno, 132 Wn. App. 663, 132 P.3d 1137 (2006). In that case, the prosecutor said that Moreno "has exercised his constitutional rights to defend himself because power is that important to him." 132 Wn. App. at 672. The State conceded the remark was improper because it was a direct comment on Moreno's decision to represent himself. Id. Unlike in Moreno, the prosecutor did not explicitly refer to Thornton's right to be represented by counsel; he was discussing Thornton's failure to raise self-defense earlier in the proceeding. Because the statements did not refer to Thornton's constitutional right to counsel, they were not improper.

Finally, Thornton argues the prosecutor, by arguing that Thornton "failed to meet" the criteria of self-defense, shifted the burden of proving self-defense to Thornton. We agree. Rather than arguing that the State proved Thornton did not act in self-defense, the prosecutor improperly argued Thornton failed to establish he did act in self-defense.

Once a trial court determines there is evidence to support an instruction on justifiable homicide, the State must prove the absence of self-defense beyond a reasonable doubt. State v. Brightman, 155 Wn.2d 506, 520, 122 P.3d 150 (2005). Generally, the State may not comment on the lack of defense evidence because

the defense has no duty to present evidence. State v. Thorgerson, 172 Wn.2d 438, 467, 258 P.3d 43 (2011). Because Thornton objected to the prosecutor's argument and specifically raised a concern about burden shifting, we review the trial court's ruling under the abuse of discretion standard. McCreven, 170 Wn. App. at 468.

The State argues it did not shift the burden of proof but merely challenged Thornton's credibility. When a defendant chooses to testify, the State may vigorously cross examine him in the same manner as any other witness. State v. Etheridge, 74 Wn.2d 102, 113, 443 P.2d 536 (1968). A prosecutor may challenge the credibility of the defendant's testimony. See State v. Boisselle, 3 Wn. App.2d 266, 293-94, 415 P.3d 621 (2018) (no misconduct to challenge credibility of defendant's testimony that he shot victim in self-defense). "It is not misconduct for a prosecutor to argue that the evidence does not support the defense theory." Boisselle, at 292, quoting State v. Graham, 59 Wn. App. 418, 429, 798 P.2d 314 (1990).

But the State's characterization of the prosecutor's closing argument does not reflect a fair reading of it. The prosecutor repeatedly told the jury that Thornton failed to meet the first, second, and third elements of self-defense and, as a result," "[h]is defense fail[ed]." The prosecutor told the jury it did not need to consider the second element of the defense because Thornton failed to meet the first element. He told the jury it did not need to consider the third element because Thornton failed to meet the second one.

The State argues the prosecutor's comments are analogous to those found proper in State v. Jackson, 150 Wn. App. 877, 209 P.3d 553 (2009) and State v. Killingsworth, 166 Wn. App. 283, 269 P.3d 1064 (2012). We do not agree. In Jackson, the court held the prosecutor did not shift the burden of proof by arguing that "there was not a single shred of testimony in this case to corroborate [a defense witness's] story." 150 Wn. App. at 885. The court held the prosecutor did not argue the defendant failed to present witnesses but instead outlined the reasons why it should find the State's witnesses more credible than Jackson's witness. Id. The prosecutor here did not argue that the evidence did not corroborate Thornton's story; he argued Thornton failed to present evidence that his fear was reasonable or that the harm he feared was imminent.

In Killingsworth, the defendant was charged with theft of a motor vehicle, first degree trafficking in stolen property and taking a motor vehicle without permission. 166 Wn. App. at 286. He argued on appeal the prosecutor shifted the burden of proof and impermissibly commented on his failure to testify in his own defense when he argued there was "no reasonable explanation" for the events other than the defendant's guilt. Id. at 290. This court disagreed, concluding that the prosecutor had not argued *the defense* failed to offer other reasonable explanations for his presence in an abandoned, stolen vehicle. 166 Wn. App. at 291-92. But unlike Killingsworth, the prosecutor here did argue that Thornton failed "to meet" the criteria for self-defense defense.

Thornton relies on State v. McCreven, 170 Wn. App. 444, 284 P.3d 793 (2012) as more analogous. In that case, four men were convicted of second

degree felony murder arising out of a stabbing death during a fight in a bar parking lot. The prosecutor argued, based on erroneous jury instructions, that the defendants had to prove self-defense by a preponderance of evidence. Id. at 469-70. In rebuttal the prosecutor acknowledged the State had the burden of disproving self-defense but then stated "for the State to disprove self-defense, first there must be proof of self-defense." Id. at 470. Over defense objections, the prosecutor asked "How do I disprove that the Defendant reasonably believed that there was imminent danger, when there has been no evidence that the Defendant reasonably believed that there was imminent danger?" Id.

This court concluded the prosecutor's statements were improper. The trial court had determined there was sufficient evidence to submit a self-defense instruction to the jury. The court concluded the prosecutor's suggestion to the contrary improperly shifted the burden of proof to the defense by suggesting there was nothing for the State to disprove. 170 Wn. App. at 471.

McCreven is more analogous than Jackson or Killingsworth. When challenging a defendant's claim that he acted in self-defense, a prosecutor may not argue that the State's burden to disprove self-defense only arises if a defendant establishes he had a reasonable belief he faced imminent danger from the victim. The prosecutor's argument here was similar to that in McCreven because the prosecutor argued that even if the jury took Thornton's testimony at face value, "he" (meaning Thornton) did not establish any of the three elements of the claim of self-defense. This was a burden he did not bear under the law and the argument constituted classic burden shifting.

Because the prosecutor's closing argument was improper, we must consider whether it was prejudicial to Thornton. To demonstrate prejudice, Thornton must show that, based on the circumstances of the entire case, there was a substantial likelihood the misconduct affected the jury's verdict. McCreven, 170 Wn. App. at 468; see also State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). In analyzing prejudice, we look at a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence, and the jury instructions. State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008); State v. Walker, 164 Wn. App. 724, 730, 265 P.3d 191 (2011), review granted, cause remanded, 175 Wn.2d 1022, 295 P.3d 728 (2012).

Unlike McCreven, the trial court properly instructed the jury that the State had the burden of proving beyond a reasonable doubt that the homicide was not justifiable. Instruction No. 19 required the State to prove beyond a reasonable doubt that Thornton did not reasonably believe Karriem intended to inflict death or great personal injury and did not reasonably believe there was imminent danger of that harm being accomplished. The prosecutor acknowledged that the burden of proof rested with the State. Defense counsel also spelled out for the jury that the State must show an absence of self-defense, and "when the State talks about how the defense fails, you don't allow yourself to be taken in by that and seek to make a case for self-defense." To the extent the prosecutor's argument suggested otherwise, the trial court instructed the jury to disregard any argument of counsel not supported by the evidence or the law in the instructions. These factors weigh against a finding of prejudice.

The self-defense argument was not a passing comment but was the focus of the entire closing argument. Thornton admitted killing Karriem. The sole issue, as to the murder charge, was whether his actions were legally justified. The centrality of the prosecutor's comments about Thornton failing to meet the criteria to establish self-defense weighs in favor of a finding of prejudice.

The State contends Thornton's testimony was the only evidence supporting a theory of self-defense. But that contention is not supported by the record. Thornton and Pace both testified that Karriem had shot at Thornton within months of the New Year's Eve shooting. Pace testified he approached Karriem and Ray to suggest a fist fight as a way of preventing further gun violence between the men. The State did not dispute the prior shooting incident occurred.

Additionally, Thornton and Pace both testified they believed Karriem was armed that night. This belief was obviously well-founded; police found a loaded gun in Karriem's right front coat pocket. Pace confirmed Thornton's testimony that Karriem kept his hands in his pockets and, as Pace testified, "you assume when someone has their hand in their pocket," they are armed. Pace also testified Karriem was speaking angrily at Thornton. When Thornton refused to fight, Pace told Thornton the situation could turn deadly. A jury could have found this evidence sufficient to create a reasonable doubt as to whether Thornton reasonably believed Karriem intended to shoot him. This evidence weighs in favor of a finding of prejudice.

Moreover, the issue of whether Thornton reasonably believed Karriem presented an imminent threat to his life rested in significant part on Thornton's

credibility. Pace, Ray, and Santos confirmed Karriem did not brandish his firearm. Pace, Ray, and Santos also testified that Karriem backed away and told Thornton not to shoot him. Thornton, however, disputed this evidence. He testified that Karriem threatened to shoot him if he saw him in the neighborhood, but then moved his body and head in a way that caused Thornton to conclude "something's actually going to happen." A jury could have found this evidence sufficient to create a reasonable doubt as to whether Thornton reasonably believed Karriem presented an imminent threat of death or great bodily harm. This evidence similarly weighs in favor of a finding of prejudice.

Finally, the State's case relied heavily on the testimony of Thornton's friend, Pace. But Pace's credibility was at issue throughout trial. Pace had a plea agreement with the State allowing him to plead guilty to rendering criminal assistance in exchange for his testimony against Thornton. During the January 9, 2015, police interview, Pace initially refused to disclose information unless the police promised to release him. He identified Thornton as the shooter only after Pace learned he could be held responsible for Karriem's murder as an accomplice.

And Pace's testimony that he abandoned Thornton and the Expedition two blocks from the scene of the shooting was inconsistent with Facebook posts Thornton had showing them partying together that night. Given that Pace admitted the Expedition belonged to a "girl that [he] knew," and according to Thornton, belonged to the woman with whom Pace spent the night, the jury certainly could have questioned much of Pace's testimony, including the damning testimony that Thornton told him he shot Karriem in revenge for slighting him after the cell phone

robbery. Indeed, the prosecutor admitted in closing that "Carlos Pace is looking out for numero uno," acknowledging that "there's probably very little doubt that he's minimizing certain portions to make himself maybe look a little less dirty."

When a jury faces a credibility contest, such as was presented here, a prosecutor's improper arguments can make the difference. See Walker, 164 Wn. App. at 738. Given the conflicting evidence the jury had to consider, as well as the credibility contest between Thornton and Pace regarding Thornton's motivation for shooting Karriem, we conclude the prosecutor's argument that Thornton failed to prove self-defense was prejudicial. This error requires the reversal of only the murder conviction and a remand for a new trial on that charge. Because Thornton did not assert he shot at Ray in self-defense, any error in the closing argument regarding the burden of proving self-defense does not affect Thornton's conviction for assault in the first degree.

## 2. Admission of Carlos Pace's Interrogation Video

Thornton next argues we should reverse both convictions because the trial court erroneously admitted the video of Pace's January 9, 2015 interrogation. We disagree.

Following Pace and Thornton's arrest on January 9, 2015, officers questioned the two men separately. Both interviews were videotaped. Detective Mooney testified he and his partner, Detective Huber, interviewed Pace first and that Pace recounted his version of events to them. Mooney and Huber then interviewed Thornton who denied any involvement in the shooting. Mooney testified Pace offered to talk to Thornton through the interview room door. The

State then played the video interview with Thornton, including the portion where Thornton can be seen and heard responding to Pace's questions and comments. Thornton told Pace repeatedly they were not going to get into trouble or be charged because they had done nothing wrong.

During Thornton's cross-examination of Pace, he challenged Pace's credibility by eliciting information that Pace asked for a deal from the detectives in exchange for testimony against Thornton. Pace denied that the detectives had offered him a deal, but admitted he told police if he was going to tell on Thornton, he needed to be released from custody. Pace also admitted he only identified Thornton as the shooter after the detectives informed him that he faced accomplice liability for the murder.

Thornton further pointed out that Pace told police Thornton had picked him up in Federal Way on New Year's Eve, while at trial he testified Pace drove to his mother's house in South Seattle and met Thornton there. Pace admitted he told police he was not sure who suggested going "head up" that evening whereas at trial Pace claimed it was his idea. Thornton questioned Pace's statement at trial that Thornton's beef was with Karriem; Pace admitted telling the detectives he thought Thornton had a dispute with both Karriem and Ray. And Thornton challenged Pace's testimony that Thornton told him he shot Karriem because of the cell phone heist:

Q: But in your discussion with them on January 9th, 2015, you did not describe Mr. Thornton telling you between the time –

A: [by Pace] I don't know.

Q: -- between the time of the shooting and your getting out of the vehicle that the reason he did this was because the guy or the dude had gotten over on him; you did not say that, then, correct?

A: I did tell them that.

Q: On January 9th?

A: No. What I said was that he, when he did all that, we got down the road; I'm yelling at him. I proceeded to ask him why. That's when I cut it short to him saying, okay, he got over on me, he proceeded to say something about a cell phone that they had hit. That should be in there.

Q: All right. My question is simply on January 9th --

A: No.

Q: -- you did not tell the police that Mr. Thornton had said something about the reason he did it was because the guy had gotten over on him?

A: Yes, I did. I did.

Thornton suggested the first time Pace ever mentioned anything about Thornton saying he shot Karriem because "the guy got over on him" was in a January 2017 defense attorney interview. But Pace insisted he told Mooney "about the whole situation" in the initial January 9, 2015 interview. Mooney, however, testified that Pace did not tell him in that interview why Thornton had shot Karriem.

After Pace testified, the State notified defense counsel of its intent to offer the video of Pace's interview as a prior consistent statement under ER 801(d)(1)(ii). Thornton objected, arguing the only allegation of recent fabrication was Pace's testimony that Thornton told Pace he shot Karriem because "Karriem had gotten over on him." He argued that nothing in the video qualified as a prior consistent statement. The State argued the entire video interview rebutted Thornton's charge of recent fabrication and the allegation of improper influence or motive. It cited to State v. Thomas, 150 Wn.2d 821, 83 P.3d 970 (2004) in which

- 24 -

the Supreme Court affirmed the admission of a co-defendant's prior statements to law enforcement after his credibility was challenged on cross examination. The State also contended the video would rebut Thornton's suggestion that the detectives made some promise to Pace in exchange for his pointing the finger at Thornton.

The trial court admitted the video, reasoning that State v. Thomas was "dispositive on this issue." The trial court ruled "Pace was repeatedly asked about his immunity agreement, promises that were made, and his credibility was clearly brought in question by your cross-examination. And there were certainly at least inferences that he was not being honest in one context or another, given all the interviews that he did."

The State then showed the Pace video to the jury. At the beginning of Pace's interview, Pace hesitated to disclose any information to the police. He insisted to Mooney and Huber that he had nothing to do with the shooting and told detectives if he was going to talk about Thornton's involvement, he needed a deal from them in writing. He specifically asked to be released. One detective told Pace that they could make no promises to him, that they knew Pace had been involved in some way, and that he faced being charged with murder in the first degree as Thornton's accomplice. Pace then recounted the events leading up to Thornton shooting Karriem. Pace told police Thornton and Ray, who he knew to be Thornton's cousin, were "beefing" because they had stolen some merchandise from a T-Mobile store. He told police they had not planned on running into Ray

and Karriem and when he saw them, he jumped out of the SUV, shook hands with them, and talked about working out the dispute with Thornton through a fist fight.

Pace then stopped, and again asked the detectives whether they could "have something" for him. Mooney assured Pace that being honest would be ideal "for the best possible outcome." He offered to speak with prosecutors about his cooperating, adding "You don't deserve to go down for this." But Mooney reiterated he had a booking sheet with Pace's name on it and the prosecutors would listen to the interview and take it into consideration. Pace then decided again to walk the two detectives through events on New Years' Eve and confirmed Thornton shot Karriem. When asked why, Pace said he did not know but thought Thornton was scared to fight.

After the detectives interviewed Thornton, they let Pace know Thornton claimed he and Pace were together all evening at Thornton's grandmother's house and neither had gone anywhere near the grocery store. Pace suggested the detectives "crack the door open," so he could talk with Thornton, knowing the video recording would capture what was said between them.

The detectives allowed Pace to talk to Thornton. For approximately 12 minutes, the video and audio captures Pace pleading with Thornton to admit what happened and repeatedly asking him to "tell the truth." He told Thornton that he could not go down "for [Thornton's] shit," that he could not take the blame for "some shit that you [Thornton] just did," and that had Thornton just gone head up with the men, they would not be in this trouble. When Thornton is heard denying any

involvement, Pace told Thornton "[she's] already seen your face. She knows you shot her boyfriend."

Thornton argues the trial court abused its discretion in admitting Pace's interrogation video. Thornton asserts that the trial court erroneously admitted the video as a prior consistent statement under ER 801(d)(1)(ii) because Pace demonstrated he had a motive to fabricate in the interview with law enforcement.

We review a trial court's decision to admit or exclude evidence for abuse of discretion. Peralta v. State, 187 Wn.2d 888, 894, 389 P.3d 596 (2017). We will reverse a trial court's evidentiary ruling only when no reasonable person would take the view adopted by the trial court. Id.

ER 801(d)(1) provides:

A statement is not hearsay if –

(1) Prior Statement by Witness. The declarant testifies at the trial or hearing and is subject to cross examination concerning the statement, and the statement is ... (ii) consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive ...."

Prior out-of-court statements, consistent with a witness's testimony at trial, are not admissible to reinforce or bolster the testimony of that witness. Thomas v. French, 99 Wn.2d 95, 103, 659 P.2d 1097 (1983). But if there is an inference raised in cross examination that a witness changed his story in response to an external pressure, then whether that witness gave the same account of the story prior to the onset of that external pressure becomes highly probative of the veracity of the witness's story while testifying. State v. Thomas, 150 Wn.2d at 865. "Accordingly, the proponent of the testimony must show that the witness's prior consistent

statement was made *before* the witness's motive to fabricate arose in order to show the testimony's veracity and for ER 801(d)(1)(ii) to apply." Id. Cross examination alone does not justify admission of prior consistent statements; the questioning must raise an inference sufficient to allow counsel to argue the witness had a reason to fabricate his story later. State v. Bargas, 52 Wn. App. 700, 702-03, 763 P.2d 470 (1988).

In Thomas, the defendant's ex-wife testified about the defendant's involvement in a murder and burglary. The ex-wife testified the defendant called her from the victim's house, told her "it is done," asked her to pick him and a co-defendant up from the house, then followed him in her car as he drove the victim's van to an isolated location near Gig Harbor, and watched as the defendant torched the victim's van. 150 Wn.2d at 835-36. On cross, defense counsel elicited testimony regarding the plea deal she had entered into with the State in exchange for her testimony. 150 Wn.2d at 866. Counsel also pointed out consistencies and inconsistencies in her multiple statements to law enforcement. Id.

The Supreme Court held that the defendant's cross examination strongly suggested he was trying to show the ex-wife had a motive to fabricate in order to receive the plea deal in exchange for her testimony. Because there was an implied claim of recent fabrication, ER 801(d)(1)(ii) was triggered. Id.

Thomas is analogous to this case. Like the ex-wife, Pace was charged with rendering criminal assistance and given a plea deal in exchange for his testimony against the defendant. As in Thomas, Thornton's cross examination of Pace pointed out inconsistencies in the multiple interviews he gave and his trial

testimony. Most importantly, Thornton admitted that his cross examination of Pace implied Pace had fabricated the story about Thornton saying, in the immediate aftermath of the shooting, that he had killed Karriem for shorting him on proceeds from a robbery. As the Supreme Court stated in Thomas, whether the witness had a motive to minimize his or her involvement and how much weight to be given that determination "was properly left within the auspices of the jury." 150 Wn.2d at 866.

Thornton argues Thomas does not control because when the ex-wife in that case made her prior consistent statements to girlfriends, there was no indication she understood the legal significance of her statements. He cites to State v. Makela, 66 Wn. App. 164, 168-69, 831 P.2d 1109 (1992) for the proposition that "a charge of recent fabrication can be rebutted by the use of prior consistent statements only if those statements were made under circumstances indicating that the witness was unlikely to have foreseen the legal consequences of his or her statements."

But Thornton misreads the holding in Makela. In that case, a victim alleged the defendant had molested her as a child. The defense theory was that this victim fabricated the allegations from the time she was 9 years of age. He also alleged the victim had additional motives to lie that arose at the time she reported the abuse. The trial court permitted several childhood friends of the victim to testify that she had disclosed the abuse to them long before she reported it to the police. 66 Wn. App. at 167-68. The defendant argued that admitting this testimony was error because the victim had a motive to fabricate when she made the disclosures to her friends. Id. at 172-73.

The court stated that the "mere assertion that motives to lie may have existed at the time of the prior statement is insufficient to prevent their admission." Id. at 173. Instead, the trial court must decide, as a threshold matter, whether the proffered motive evidence rises to the level necessary to exclude the prior consistent statement. Once that threshold determination is made, it is for the jury to weigh the testimony against the defense theory that the witness was motivated by something other than the truth to make the statement. Id. at 173-74. The court agreed with the trial court that the proffered motive evidence was not sufficient to exclude the prior consistent statement.

In this case, the trial court did not err in concluding that Thornton had not demonstrated Pace's motive to lie to police officers rose to the level necessary to exclude his prior statements to them. First, the State proffered evidence that the detectives made no promise of favorable treatment when Pace chose to identify Thornton as the shooter. Second, Thornton did not dispute much of what Pace told the police in the interview. Thornton admitted Pace had suggested he go "head up" with Karriem or Ray to resolve whatever dispute the men previously had, just as Pace explained to the detectives. Thornton admitted he refused to fight, again as Pace told the police. Thornton admitted he shot Karriem, just as Pace told the police. And Pace told the police he believed Karriem was armed, information that led the detectives to ask Thornton if he shot Karriem in self-defense. Although Thornton disputed Pace's statement that he abandoned Thornton and the blue SUV shortly after the shooting, this dispute was not relevant

to Thornton's self-defense defense. Pace did not tell police Thornton had not acted in self-defense; in fact, he told the police he thought Karriem had a gun.

Pace may have had a generalized motive to lie to the police about his movements after the shooting to minimize his own involvement. Pace obviously hoped he might escape criminal liability and specifically asked the detectives if they would release him if he told them what he knew. But the police made him no promises of leniency and Pace did not enter into a plea agreement until August 2015, seven months later. And Pace would have had no motive to lie about whether Thornton shot Karriem in self-defense. Had Thornton done so, it would have been possible that neither Thornton nor Pace would have faced prosecution. Pace could have been just as motivated to tell the truth to avoid criminal liability as to fabricate a story to do so. Under Thomas, whether Pace was motivated to lie to police on January 9, 2015, was for the jury to decide. The trial court did not abuse its discretion in admitting the interview.

Thornton argued at oral argument that even if some portions of Pace's interview were admissible, the part of the videotape where Pace can be heard begging Thornton to tell the truth was not a "prior consistent statement" and was so prejudicial as to constitute reversible error. We can find no indication Thornton raised this argument with the trial court. Thornton sought to exclude the conversation between Thornton and Pace but only under Miranda.[2] The trial court denied that motion, concluding that Thornton's statements were made after being advised of his Miranda rights, knowing his statements were being recorded.

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Thornton has not challenged this ruling on appeal. When the parties discussed appropriate redactions to Pace's interview transcript and video, defense counsel indicated he had no objection to the conversation between Thornton and Pace other than the pretrial Miranda objection he had previously raised.

Because Thornton did not raise an evidentiary objection to the conversation between Pace and Thornton at trial, we decline to reach it for the first time on appeal. See RAP 2.5(a); State v. Embry, 171 Wn. App. 714, 740, 287 P.3d 648 (2012) (defendant's failure to timely and specifically object to testimony at trial bars him from claiming error).

We conclude the trial court did not abuse its discretion in admitting Pace's January 9, 2015 interrogation video.

### 3. Trial Irregularities

Thornton next argues that three trial irregularities deprived him of his right to a fair trial. First, Thornton contends trial spectators "cried and yelled" at Thornton in front of the jury. Second, Thornton argues Pace told him to "man up" during Pace's cross-examination. Third, a juror fainted when the medical examiner displayed autopsy photos during his testimony. The State argues Thornton waived any claim with respect to two of the irregularities by failing to object, that none of the irregularities was serious, and that proper instructions to the jury would have cured any prejudice. We agree.

The first incident occurred when the State played the Victory Grocery's surveillance video of the shooting. Thornton's counsel informed the court that he heard "noises, audible noises, from members of the audience [he] cannot identify"

when the shooting was shown in the video. Thornton believed he heard someone say "let me get up out of here before I hurt this nigga punk ass bitch." The trial court stated it heard some noises from spectators and admonished the audience, saying "We need to have order in the courtroom." Neither the court nor the prosecutor heard any specific statements. Thornton moved for a mistrial based on the spectators' outbursts.

In denying Thornton's motion for a mistrial, the trial court said that while it heard angry voices coming from the audience, the words themselves were indiscernible. The trial court reasoned that because the angry comments could not be heard from the bench, the jury likely did not hear anything as jurors were focused on watching the video. The trial court also said it could not justify a mistrial based on emotional outbursts from family members because the cries were quick and to be expected in a murder trial. Finally, the trial court concluded that the irregularity was not serious because it did not weigh on the ultimate issue: self-defense. The trial court noted it was undisputed a shooting occurred and Thornton pulled the trigger; the only issue was self-defense. The trial court offered to give a curative instruction at Thornton's request, but Thornton never requested an instruction.

The second incident occurred during Thornton's cross-examination of Pace, when Pace asked Thornton "Why don't you just man up? Why don't you?" In response, the trial court admonished Pace to wait for a question. Thornton did not move to strike this comment, request a curative instruction to have the jury disregard the comment, or move for a mistrial.

The third incident occurred when a juror abruptly asked for a break and left the courtroom during the medical examiner's testimony while he was displaying autopsy photographs. In response, the trial court ordered a recess, and both the State and Thornton were given the opportunity to question the juror. The juror said he was sometimes affected by "medical images or descriptions," but stated that his reaction would not affect his decision in the case. Thornton did not ask to have the juror dismissed or move for a mistrial.

As an initial matter, because Thornton did not object or move for a mistrial after the second and third incidents, we conclude those issue have not been preserved on appeal. The Supreme Court has repeatedly said that relief must be sought at the time of a trial irregularity for preservation of the issue on appeal. See State v. Lord, 161 Wn.2d 276, 165 P.3d 1251 (2007) (defense failure to object or move for mistrial based on spectators wearing buttons with the victim's face printed on them constitutes waiver, unless manifest constitutional error is found).

Thornton did seek a mistrial after the spectator outbursts occurred. But not all spectator outbursts necessitate a new trial. A new trial is only necessary when the defendant "has been so prejudiced that nothing short of a new trial can insure that the defendant will be treated fairly." State v. Bourgeois, 133 Wn.2d 389, 406, 945 P.2d 1120 (1997) (quoting State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)). The decision to deny a new trial will not be disturbed unless there is "clear abuse of discretion." Id. (quoting State v. Bartholomew, 98 Wn.2d 173, 211, 654 P.2d 1170 (1982)). An abuse of discretion occurs when "no reasonable judge

would have reached the same conclusion." Id. (quoting Safie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711 (1989)).

In determining the effect of any irregularity, an appellate court should examine its seriousness, whether it involved cumulative evidence, and whether the trial court properly instructed the jury to disregard it. Bourgeois, 133 Wn.2d at 409. In this case, the record indicates only Thornton heard the specific negative statements about him. The prosecutor, defense counsel, and the trial court admitted that while they could hear angry voices, they could not make out the words. And, as the trial court noted, the defense theory was self-defense and there was no dispute that Thornton shot and killed Karriem. The spectator's comments about Thornton did not undermine this theory. Finally, the trial court offered to give a curative instruction; Thornton did not ask that one be given. The jury was instructed that its decision was to be based solely on evidence admitted at trial. Thornton has not demonstrated that any spectator outburst interfered in any way with the jury's verdict.

4. Narration of the surveillance video from Victory Grocery.

Thornton argues the trial court erred in allowing Mooney to narrate the events depicted in the surveillance footage from Victory Grocery, contending this narration invaded on the province of the jury. An appellate court reviews a trial court's decision to admit or exclude evidence for abuse of discretion. Salas v. Hi-Tech Erectors, 168 Wn.2d 664, 668, 230 P.3d 583 (2010). We conclude the trial court did not abuse its discretion in overruling Thornton's objections because the detective did not identify any individuals in the video and did not express an opinion about any disputed fact.

The surveillance video captured events leading up to the shooting and the shooting itself from two of its nine cameras. Because there were multiple videos depicting the same events from different angles, Mooney provided the jury with a generalized description of the location of each camera and what was visible from each angle. He identified three people visible on one camera shot and pointed out when they became visible on a different camera. He identified one of the individuals as female. He described a man leaving the SUV and walking toward and contacting two people who had previously stood in front of the store. Mooney stated one of the men appeared to be wearing a backpack. He then identified two men walking up to an SUV. He then stated "[t]he male with the backpack, when the shots are fired, he breaks eastbound. You can see him stumbling, falling to the ground, with the backpack on." Mooney then looked at a different camera angle and identified a second male falling to the ground, kneeling next to a male and female. Finally, he identified the first patrol officer arriving on the scene shortly thereafter.

The trial court overruled Thornton's objections to Mooney's narration, with the exception that it ruled Mooney could not identify any of the individuals in the video by name.

Thornton argues the trial court abused its discretion in overruling his objections to the narration, relying on State v. George, 150 Wn. App. 110, 206 P.3d 697 (2009). In George, two defendants were charged with the robbery of a Days Inn. 150 Wn. App. 110, 114, 206 P.3d 697 (2009). The trial court permitted a detective to identify the perpetrators based on his viewing of a surveillance video.

Id. at 117. This court held the trial court abused its discretion in permitting this identification because the detective was in no better position than the jury to identify the individuals in the video. Id. at 119. The court held the error harmless as to one defendant because a Days Inn employee identified him as the gunman in the robbery. Id. However, the court concluded the error was not harmless as to the co-defendant because no other evidence linked him to the robbery. Id. at 120.

George is not analogous. First, unlike George, no one disputed the identity of the individuals visible in the Victory Grocery video. Santos, Ray, Pace, and Thornton all testified that they were present outside the store that evening. They described their physical movements in a way that was consistent with Mooney's testimony.

Second, the identity of the shooter was not an issue here. In George, the key question was who committed the robbery and the detective's narration incriminated the defendants. 150 Wn. App at 117. In this case, Thornton admitted pulling the trigger and Mooney did not express any opinion as to how the shooting occurred. Unlike George, Mooney did not refer to any of the individuals in the video by name, even though their identities were not in dispute.

Thornton does not contend that Mooney misrepresented anything in the video. Instead, Thornton asserts that the narration was biased in favor of the State because Mooney did not describe Karriem's pacing back and forth with his hands in his pockets and did not mention that Karriem was armed. We do not find this argument persuasive.

Mooney testified about the general movements of the people and vehicles from one camera angle to another. He did not describe everything to be seen in the videos. Thornton was free to point out to the jury, and in fact did argue, that the surveillance video captured Karriem pacing back and forth while talking to Thornton. He could also point out, and did argue, that the video corroborated Thornton's testimony that Karriem and Ray were not walking away from the SUV, but instead Karriem was advancing toward him. Mooney did not embellish his narration with perceptions of what he thought he saw or what he discovered after the fact. We find no abuse of discretion in overruling Thornton's objections to Mooney's limited video narration.

### 5. Thornton's Jail Phone Calls

The State played 25 audio clips from recorded phone calls Thornton made from jail. Thornton argues recording his phone calls violated his right to privacy, his right to counsel, and his right to present a defense. These arguments have no merit.

It is established in Washington that inmates do not have a reasonable expectation of privacy in telephone calls in a local jail. Thornton acknowledges that inmates' phone calls are not subject to a reasonable expectation of privacy and we have repeatedly declined to suppress evidence of jail phone calls on the basis that they violate that right. See State v. Archie, 148 Wn. App. 198, 204, 199 P.3d 1005 (2009) (phone calls made from King County Jail by pretrial detainee were not private affairs subject to article I, section 7 protection because "the Washington State Supreme Court has recognized the need for monitoring inmate

communications and has found no invasion of privacy when other forms of inmate communications are inspected so long as inmates have been informed of that likelihood"); State v. Haq, 166 Wn. App. 221, 260-62, 268 P.3d 997 (2012) (recording of inmate's phone calls did not violate, and admission of the phone calls at trial was relevant of the defendant's state of mind at the time he committed the crime); State v. Mohamed, 195 Wn. App. 161, 166, 380 P.3d 603 (2016) (phone calls between codefendants, one who had been released from custody and the other who remained in jail, were not considered private communications subject to the privacy act). Thornton's privacy claim lacks merit.

Nor do the recordings violate Thornton's constitutional rights to counsel and to present a defense. In many of the calls, Thornton described his legal defense strategy, and the strength or weakness of various legal defenses, to third parties. But he was not talking with his attorney in any of these calls. The admission of the phone calls did not infringe on Thornton's right to counsel or his right to present his defense.

### 6. Cumulative Error

Finally, Thornton contends that even if the alleged errors alone were harmless, in the aggregate, they were prejudicial and warrant a new trial. "Under the cumulative error doctrine, [a court] may reverse a defendant's conviction when the combined effect of errors during trial effectively denied the defendant [his] right to a fair trial, even if each error standing alone would be harmless." State v. Venegas, 155 Wn. App. 507, 520, 228 P.3d 813 (2010). The cumulative error doctrine does not apply when there are few errors that have no effect on the trial's

outcome. Id. We are convinced that none of the issues Thornton has raised had any effect on Thornton's conviction for assault. And we are reversing the murder conviction on other grounds. We therefore reject his cumulative error argument.

Because we affirm Thornton's assault conviction but reverse the murder conviction, we also reverse his sentence on the assault conviction as his offender score for that offense may be affected by the outcome of any new trial on the murder charge.

Affirmed in part, reversed in part and remanded for proceedings consistent with this decision.

WE CONCUR:

Andrus, J.

Mann, ACJ